No. 17-4630

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

**v.**

### PATRICK FALTE,
*Defendant/Appellant.*

---

**On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. John A. Gibney, Jr.)**

---

### JOINT APPENDIX

### VOLUME I of II (pages 1 - 142)

---

**DANA J. BOENTE**
**United States Attorney**

**Jessica D. Aber**
**Assistant U.S. Attorney**
**Lauren E. Britsch**
**Special Ass't U.S. Attorney**
**Counsel for Appellee**
**919 East Main Street, Suite 1900**
**Richmond, VA 23219**
**(804) 819-5400**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Frances H. Pratt**
**Carolyn V. Grady**
**Assistant Federal Public Defenders**
**Counsel for Appellant**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**

This page intentionally left blank for double-sided pagination and printing

# **TABLE OF CONTENTS**

## VOLUME I (pages 1 - 142)

District Court Docket Sheet (as of Dec. 20, 2017). . . . . . . . . . . . . . . . . . . . . . . . . 1

Information (May 4, 2017, Doc. 44). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Transcript, Plea Hearing (May 10, 2017, Docs. 46, 73/75). . . . . . . . . . . . . . . . 7

Waiver of Indictment (May 10, 2017, Doc. 47). . . . . . . . . . . . . . . . . . . . . . . . . 46

Plea Agreement (May 10, 2017, Doc. 48). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Statement of Facts (May 10, 2017, Doc. 49). . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Motion Pursuant to U.S.S.G. § 3E1.1(b) (Aug. 30, 2017, Doc. 52). . . . . . . . . . . 61

Position of the United States With Respect to Sentencing
    (Aug. 30, 2017, Doc. 53). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Defendant's Amended Position on Sentencing and Request for a
    Non-Guideline Sentence (Sept. 10, 2017, Docs. 62, 63). . . . . . . . . . . . . . . . 72

    Attachment A (letter from defendant's mother). . . . . . . . . . . . . . . . . . . . . . 90
    Attachment B (letter from defendant's father). . . . . . . . . . . . . . . . . . . . . . . 91
    Attachment C (letter from defendant's sister). . . . . . . . . . . . . . . . . . . . . . . 92
    Attachment E (letter from defendant's doctor). . . . . . . . . . . . . . . . . . . . . . 94
    Attachment F (article from *Psychology Today*). . . . . . . . . . . . . . . . . . . . . 95

Transcript, Sentencing Hearing (Sept. 15, 2017, Docs. 66, 73). . . . . . . . . . . . 102

    Preliminary matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

    Defendant's evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

        Charles Falte                    Direct examination. . . . . . . . . . . . 107

i

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

    By the government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
    By the defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Allocution by defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Court's consideration of § 3553(a) factors. . . . . . . . . . . . . . . . . . 124

Imposition of sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Judgment in a Criminal Case (Sept. 19, 2017, Doc. 67). . . . . . . . . . . . . . . . . . 134

Notice of Appeal (Oct. 3, 2017, Doc. 69). . . . . . . . . . . . . . . . . . . . . . . . . . 140

### VOLUME II (pages 143 - end) – SEALED

Supplemental Sentencing Memorandum of the United
    States (Aug. 30, 2017; *see* Docs. 54, 64). . . . . . . . . . . . . . . . . . . . . . . 143

Presentence Report (final) (Aug. 31, 2017, Doc. 58). . . . . . . . . . . . . . . . . . 147

Sealed Statement of Reasons (Sept. 19, 2017, Doc. 68). . . . . . . . . . . . . . . . . 169

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia – (Richmond)
## CRIMINAL DOCKET FOR CASE #: 3:17–cr–00049–JAG–1

Case title: USA v. Falte

Magistrate judge case number:  3:16–mj–00241–DJN

Date Filed: 05/04/2017

Date Terminated: 09/19/2017

Assigned to: District Judge John A. Gibney, Jr

Appeals court case number: 17–4630 USCA

### Defendant (1)

| | |
|---|---|
| **Patrick Falte**<br>*TERMINATED: 09/19/2017* | represented by **Carolyn V. Grady**<br>Office of the Federal Public Defender (Richmond)<br>701 E Broad Street<br>Suite 3600<br>Richmond, VA 23219<br>804–565–0855<br>Fax: 804–648–5033<br>Email: Carolyn_Grady@fd.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2241(c): AGGRAVATED SEXUAL ABUSE<br>(1) | LIFE IMPRISONMENT; $100 S/A |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18:2241(c); Aggravated Sexual Abuse of a Minor: the defendants did knowingly cross a state line with the intent to engage in a sexual act with a person who has not attained the age of 12 years | |

### Plaintiff

**J.A. 1**

**USA**                                        represented by **Jessica Diane Aber**
                                               US Attorney Office (Richmond)
                                               SunTrust Building
                                               919 East Main Street
                                               Suite 1900
                                               Richmond, VA 23219
                                               804–819–5400
                                               Fax: 804–771–2316
                                               Email: Jessica.D.Aber@usdoj.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: US Attorney*

                                               **Elham Peirson**
                                               Department of Justice (Criminal Division)
                                               (NA)
                                               1400 New York Ave NW
                                               6th Floor
                                               Washington, DC 20005
                                               **NA**
                                               (202) 616–5714
                                               Fax: (202) 514–1793
                                               Email: elly.peirson2@usdoj.gov
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: US Attorney*

                                               **Lauren Britsch**
                                               US Department of Justice Criminal
                                               Division
                                               Child Exploitation and Obscenity Section
                                               1400 New York Ave NW
                                               Washington, DC 20530
                                               NA
                                               (202) 514–2220
                                               Fax: (202) 514–1793
                                               Email: lauren.britsch@usdoj.gov
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/03/2016 | 1 | ARREST Warrant Returned Executed on 10/3/2016 as to Patrick Falte. (cgar) WARRANT RESCINDED [3:16–mj–00241–DJN] (Entered: 10/03/2016) |
| 10/03/2016 | 3 | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Initial Appearance as to Patrick Falte, Benjamin Faulkner held on 10/3/2016. Matter came on for initial appearances on arrest warrant out of Middle District of Tennessee. Defts advised of charges/penalties and rights. Govt's motion that Complaint remain sealed pending hearing set for 10/4/16 GRANTED. Defts requested c/a counsel. Elizabeth W. Hanes, AFPD present. FPD appointed for deft Patrick Falte. Clerk to appoint counsel from CJA panel as to deft Benjamin Faulkner. Counsel provisionally appointed pending review of financial affidavits. Counsel to complete financial affidavits. Initials continued to 10/4/2016 at 3:15 p.m. Defts remanded to custody. (Tape #FTR.)(cgar) [3:16–mj–00241–DJN] (Entered: 10/03/2016) |
| 10/03/2016 |  | Set Hearings as to Patrick Falte and Benjamin Faulkner: Continued Initial Appearances set for 10/4/2016 at 03:15 PM in Richmond Courtroom 5400 before Magistrate Judge David J. Novak. (cgar) [3:16–mj–00241–DJN] (Entered: 10/03/2016) |
| 10/03/2016 |  | Oral ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Patrick Falte. Carolyn V. Grady for Patrick Falte appointed by Magistrate Judge David J. Novak on 10/3/2016. (cgar) [3:16–mj–00241–DJN] (Entered: 10/04/2016) |

**J.A. 2**

| 10/03/2016 | 6 | Temporary Detention Order as to Patrick Falte. Signed by Magistrate Judge David J. Novak on 10/3/2016. (cgar) [3:16–mj–00241–DJN] (Entered: 10/04/2016) |
|---|---|---|
| 10/04/2016 | 4 | COMPLAINT as to Patrick Falte (1), Benjamin Faulkner (2). (wtuc) [3:16–mj–00241–DJN] (Entered: 10/04/2016) |
| 10/04/2016 | 5 | Warrant of Arrest Issued in case as to Patrick Falte and Benjamin Faulkner. (wtuc) [3:16–mj–00241–DJN] (Entered: 10/04/2016) |
| 10/04/2016 | 8 | Motion and Order of Dismissal of Complaint and Warrants issued out of the Middle District of Tennessee (Nashville Division) Patrick Falte and Benjamin Faulkner. (cgar) [3:16–mj–00241–DJN] (Entered: 10/04/2016) |
| 10/04/2016 | 10 | CJA 23 Financial Affidavit by Patrick Falte. (cgar) [3:16–mj–00241–DJN] (Entered: 10/05/2016) |
| 10/04/2016 | 11 | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Continued Initial Appearance as to Patrick Falte and Benjamin Faulkner held on 10/4/2016. Matter came on for continued initial appearances. Govt informs court of dismissal order entered by MDTN as to Rule 5 complaint and warrants. Matter continued as to complaint filed by EDVA. Defts advised of charges/penalties and rights. Defts continue to request c/a counsel. Financial affidavits executed. Counsel for defendants reaffirmed. Govt's motion to detain defts GRANTED. Detention and preliminary hearings set for October 6, 2016 at 3:45 p.m. Defts remanded to custody. (Tape #FTR.)(cgar) [3:16–mj–00241–DJN] (Entered: 10/05/2016) |
| 10/04/2016 | | Set Hearings as to Patrick Falte and Benjamin Faulkner: Detention and Preliminary Hearings set for 10/6/2016 at 03:45 PM in Richmond Courtroom 5400 before Magistrate Judge David J. Novak. (cgar) [3:16–mj–00241–DJN] (Entered: 10/05/2016) |
| 10/06/2016 | 12 | Motion to appear Pro Hac Vice by Elham Peirson with Certification of Local Counsel, Jessica D. Aber; filed by USA as to Benjamin Faulkner and Patrick Falte (rpiz) [3:16–mj–00241–DJN] (Entered: 10/06/2016) |
| 10/06/2016 | 14 | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Detention and Preliminary Hearings as to Patrick Falte and Benjamin Faulkner held on 10/6/2016. Matter came on for detention and preliminary hearings. Defts waived hearings. Waivers executed. Defts remanded to custody. (Tape #FTR.)(cgar) [3:16–mj–00241–DJN] (Entered: 10/07/2016) |
| 10/06/2016 | 16 | WAIVER of Detention Hearing by Patrick Falte. (cgar) [3:16–mj–00241–DJN] (Entered: 10/07/2016) |
| 10/06/2016 | 18 | WAIVER of Preliminary Hearing by Patrick Falte. (cgar) [3:16–mj–00241–DJN] (Entered: 10/07/2016) |
| 10/06/2016 | 22 | ORDER OF DETENTION Pending Trial as to Patrick Falte. Signed by Magistrate Judge David J. Novak on 10/6/2016. (cgar) [3:16–mj–00241–DJN] (Entered: 10/07/2016) |
| 10/07/2016 | 19 | NOTICE OF ATTORNEY APPEARANCE Lauren Britsch appearing for USA. (Britsch, Lauren) [3:16–mj–00241–DJN] (Entered: 10/07/2016) |
| 10/07/2016 | | Notice of Correction re: 19 Notice of Attorney Appearance – USA; Clerk notified filing attorney to file the Certificate of Service as a separate document and link it to the document it was omitted from. (sbea, ) [3:16–mj–00241–DJN] (Entered: 10/07/2016) |
| 10/07/2016 | 20 | ARREST Warrant Returned Executed (RULE 5) on 10/4/2016 as to Patrick Falte and Benjamin Faulkner. (cgar) [3:16–mj–00241–DJN] (Entered: 10/07/2016) |
| 10/11/2016 | 23 | ORDER granting 12 Motion by United States for Pro Hac Vice admission of Elham Peirson as to Patrick Falte and Benjamin Faulkner (signed by District Judge Henry E. Hudson on 10/11/2016 (rpiz) [3:16–mj–00241–DJN] (Entered: 10/11/2016) |
| 10/14/2016 | 28 | CERTIFICATE of Service re 19 Notice of Attorney Appearance – USA (Britsch, Lauren) [3:16–mj–00241–DJN] (Entered: 10/14/2016) |

J.A. 3

| 11/03/2016 | 34 | Consent MOTION for Protective Order by USA as to Patrick Falte, Benjamin Faulkner. (Attachments: # 1 Proposed Order)(Aber, Jessica) [3:16–mj–00241–DJN] (Entered: 11/03/2016) |
|---|---|---|
| 11/03/2016 | 35 | ORDER granting 34 Motion for Protective Order as to Patrick Falte (1) and Benjamin Faulkner (2). Signed by Magistrate Judge David J. Novak on 11/3/16. (mful) [3:16–mj–00241–DJN] (Entered: 11/03/2016) |
| 05/04/2017 | 44 | INFORMATION as to Patrick Falte Count 1. (sbea, ) (Entered: 05/05/2017) |
| 05/05/2017 | | Set Hearing as to Patrick Falte: Plea Agreement Hearing set for May 10, 2017 at 11:00 a.m. in Richmond Courtroom 6000 before District Judge John A. Gibney Jr. (sbea, ) (Entered: 05/05/2017) |
| 05/09/2017 | | Reset Hearing as to Patrick Falte: Plea Agreement Hearing set for May 10, 2017 at 10:00 a.m. in Richmond Courtroom 6000 before District Judge John A. Gibney Jr. (sbea, ) (Entered: 05/09/2017) |
| 05/10/2017 | 46 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.: Plea Agreement Hearing as to Patrick Falte held on 5/10/2017; Plea entered by Patrick Falte (1) Guilty Count 1; Sentencing set for September 26, 2017 at 9:00 a.m.; Defendant remanded to custody (Court Reporter G. Halasz, OCR.)(wtuc) (Entered: 05/10/2017) |
| 05/10/2017 | 47 | WAIVER OF INDICTMENT by Patrick Falte (wtuc) (Entered: 05/10/2017) |
| 05/10/2017 | 48 | PLEA AGREEMENT as to Patrick Falte (wtuc) (Entered: 05/10/2017) |
| 05/10/2017 | 49 | Statement of Facts as to Patrick Falte (wtuc) (Entered: 05/10/2017) |
| 05/10/2017 | 50 | Order for sentencing guidelines as to Patrick Falte. Signed by District Judge John A. Gibney, Jr. on 5/10/17. (wtuc) (Entered: 05/10/2017) |
| 05/10/2017 | | Set Hearing as to Patrick Falte: Sentencing set for 9/26/2017 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 05/10/2017) |
| 06/02/2017 | | Set Hearing as to Patrick Falte: Sentencing RESCHEDULED for 9/15/2017 at 09:00 AM in Richmond Courtroom 6000 before District Judge John A. Gibney, Jr. (wtuc) (Entered: 06/02/2017) |
| 08/11/2017 | 51 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED – government and defense counsel) as to Patrick Falte. Objections to PSI due 08/25/2017. (Attachments: # 1 Letter Victim Impact)(harris, vanessa) (Entered: 08/11/2017) |
| 08/30/2017 | 52 | MOTION for Acceptance of Responsibility by USA as to Patrick Falte. (Aber, Jessica) (Entered: 08/30/2017) |
| 08/30/2017 | 53 | Position on Sentencing by USA as to Patrick Falte (Aber, Jessica) (Entered: 08/30/2017) |
| 08/30/2017 | 54 | MOTION to Seal by USA as to Patrick Falte. (Attachments: # 1 Proposed Order)(Aber, Jessica) (Entered: 08/30/2017) |
| 08/31/2017 | 58 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED – government and defense counsel) *WITH VICTIM LETTER* as to Patrick Falte. (smith, lisa) (Entered: 08/31/2017) |
| 09/08/2017 | 60 | Position on Sentencing by Patrick Falte (Attachments: # 1 Letter, # 2 Letter, # 3 Exhibit)(Grady, Carolyn) (Entered: 09/08/2017) |
| 09/08/2017 | 61 | MOTION for Variance Sentence by Patrick Falte. (Grady, Carolyn) (Entered: 09/08/2017) |
| 09/10/2017 | 62 | Position on Sentencing by Patrick Falte *AMENDED* (Attachments: # 1 Letter, # 2 Letter, # 3 Letter)(Grady, Carolyn) (Entered: 09/10/2017) |
| 09/10/2017 | 63 | Amended MOTION for Variance Sentence by Patrick Falte. (Attachments: # 1 Letter, # 2 Letter, # 3 Letter)(Grady, Carolyn) (Entered: 09/10/2017) |

J.A. 4

| 09/11/2017 | 64 | ORDER as to Patrick Falte that the Motion for Sealing Order is granted and the requested document is sealed. It is so ORDERED. Signed by District Judge John A. Gibney, Jr. on 9/11/2017. (sbea, ) (Entered: 09/11/2017) |
|---|---|---|
| 09/15/2017 | 66 | Minute Entry for proceedings held before District Judge John A. Gibney, Jr.: Sentencing held on 9/15/2017 for Patrick Falte (1); Count 1: LIFE IMPRISONMENT; $100 S/A; Defendant remanded to custody (Court Reporter G. Halasz, OCR.)(wtuc) (Entered: 09/15/2017) |
| 09/19/2017 | 67 | JUDGMENT as to Patrick Falte (1); Count 1: LIFE IMPRISONMENT; $100 S/A. Signed by District Judge John A. Gibney, Jr. on 9/19/17. (wtuc) (Entered: 09/19/2017) |
| 09/19/2017 | 68 | Sealed Statement of Reasons as to Patrick Falte. Signed by District Judge John A. Gibney, Jr. on 9/19/17. (wtuc) (Entered: 09/19/2017) |
| 10/03/2017 | 69 | NOTICE OF APPEAL by Patrick Falte re 67 Judgment (Grady, Carolyn) (Entered: 10/03/2017) |
| 10/04/2017 | 70 | Transmission of Notice of Appeal to 4CCA as to Patrick Falte to US Court of Appeals re 69 Notice of Appeal – Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lgar, ) (Entered: 10/04/2017) |
| 10/05/2017 | | USCA Case Number 17–4630, JMoore for 69 Notice of Appeal – Final Judgment filed by Patrick Falte. (lgar, ) (Entered: 10/05/2017) |
| 10/05/2017 | 71 | ORDER of USCA as to Patrick Falte re 69 Notice of Appeal – Final Judgment: The court appoints the Federal Defender for the Eastern District of Virginia to represent Patrick Falte in this case. (lgar, ) (Entered: 10/05/2017) |
| 10/20/2017 | 72 | Transcript Order Acknowledgment from USCA re 69 Notice of Appeal – Final Judgment : Court Reporter/Transcriber Gil Halasz. (lgar, ) (Entered: 10/20/2017) |
| 11/21/2017 | 73 | TRANSCRIPT of proceedings as to Patrick Falte for dates of 05/10/2017 re 69 Notice of Appeal – Final Judgment Court Reporter/Transcriber Gil Halasz, Telephone number 804–916–2248. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? n* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 12/21/2017. Redacted Transcript Deadline set for 1/22/2018. Release of Transcript Restriction set for 2/20/2018.(halasz, gil) (Entered: 11/21/2017)** |
| 11/21/2017 | 74 | TRANSCRIPT of proceedings as to Patrick Falte for dates of 09/15/2017 before Judge Hon. John A. Gibney, Jr., re 69 Notice of Appeal – Final Judgment Court Reporter/Transcriber Gil Halasz, Telephone number 804–916–2248. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 12/21/2017. Redacted Transcript Deadline set for 1/22/2018. Release of Transcript Restriction set for 2/20/2018.(halasz, gil) (Entered: 11/21/2017)** |
| 11/27/2017 | 75 | Redaction Transcript re 73 Appeal – transcript,,,, in case as to Patrick Falte(halasz, gil) (Entered: 11/27/2017) |

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED
MAY – 4 2017
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA )
)
v. ) No. 3:17cr 049
)
PATRICK FALTE, )
)
Defendant. )

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### Count One
(Aggravated Sexual Abuse)

On or about September 30, 2016, in Eastern District of Virginia and elsewhere, the

defendant, PATRICK FALTE, did cross a State line with intent to engage in a sexual act, as

defined in 18 U.S.C. § 2246(2), with a person who has not attained the age of 12 years.

(All in violation of Title 18, United States Code, Section 2241(c).)

DANA J. BOENTE
UNITED STATES ATTORNEY

By:  Jessica D. Aber
Jessica D. Aber
Assistant United States Attorney

J.A. 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                                        Plaintiff,

        versus                              3:17CR49

PATRICK FALTE,

                                        Defendant



Before:  HONORABLE JOHN A. GIBNEY, JR.
         United's States District Judge




May 10, 2017

Richmond, Virginia



GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

**J.A. 7**

APPEARANCES


Jessica Aber, Esq.
Assistant United States Attorney
Lauren Britsch, Esq.
For the United States



Carolyn Grady, Esq.
Assistant Public Defender
for the defendant

The Defendant
In his own proper person

3

 1          THE CLERK:  Case number 3:17 CR 49.

 2          United States of America versus Patrick Falte.

 3          Jessica Aber and Lauren Britsch represent the United

 4     States.

 5          Ms Carolyn Grady represents the defendant.

 6          Are counsel ready to proceed?

 7          MS ABER:  United States is ready.

 8          MS GRADY:  Defense is ready, Your Honor.

 9          THE COURT:  Good morning everyone.

10          Good morning, Mr. Falte.

11          All right.  We are here today, as I understand it,

12     for Mr. Falte's guilty plea to an information in this

13     case.

14          All right.

15          Ms Grady, can you and Mr. Falte please come up to the

16     podium.

17          Has he signed all this stuff?

18          MS GRADY:  He has, Judge.  I was looking for copies.

19     I thought they were going to be here.  Signed copies are

20     with you, which is fine.

21          THE COURT:  That's right.  I get the signed copies.

22          MS GRADY:  Yes.  You do.  Just in case you referenced

23     something, I just wanted to have a piece of paper there to

24     show him.

25          THE COURT:  Okay.

**J.A. 9**

4

1        Mr. Falte, good morning.  I have some questions to

2   ask you to make sure that you appreciate completely what

3   we are doing today.  And I will ask that you answer these

4   questions under oath.

5        Would you please place your left hand on the bible,

6   raise your right, and face the clerk.

7                        (DEFENDANT SWORN)

8        THE COURT:  All right.

9        Mr. Falte, you pronounce, is it Falte or Falte?

10       THE DEFENDANT:  Falte.

11       THE COURT:  Sorry.

12       Mr. Falte, will you please state your full name?

13       THE DEFENDANT:  Patrick Dean Falte.

14       THE COURT:  Mr. Falte, what is your date of birth?

15       THE DEFENDANT:  XX/X/XX.

16       THE COURT:  Are you a citizen of United States?

17       THE DEFENDANT:  I am.

18       THE COURT:  Are you able to read, write and

19   understand the English language?

20       THE DEFENDANT:  I am.

21       THE COURT:  How far did you go in school, Mr. Falte?

22       THE DEFENDANT:  Bachelors.

23       THE COURT:  At where?

24       THE DEFENDANT:  ITT Tech.

25       THE COURT:  Okay.

5

1    You understand that you are now under oath, and that

2    means that if you answer any of the questions falsely

3    today that are material to this proceeding you could be

4    charged with a separate crime of perjury or making a false

5    statement under oath?

6    Do you understand that?

7    THE DEFENDANT:  I do.

8    THE COURT:  All right.

9    Do you understand that any statement you make in this

10   proceeding can be used against you in later criminal or

11   civil proceedings?

12   THE DEFENDANT:  I do.

13   THE COURT:  So just to put that in the context of

14   this case, as I understand it you are going to be

15   admitting today to an offense involving sexual abuse of a

16   minor.  If you were engaged in similar conduct elsewhere

17   your guilty plea today could be used to establish your

18   method of operation.

19   Do you understand that?

20   THE DEFENDANT:  I understand.

21   THE COURT:  Do you understand as well that I don't

22   know who the minor is, but if that minor were ever to sue

23   you for damages arising from this, your guilty plea would

24   be usable against you at that time, as well?

25   Do you understand that?

1          THE DEFENDANT:  I understand.

2          THE COURT:  Okay.

3          Mr. Falte, I have some questions to ask you now about

4     your physical and mental condition.  Are you currently

5     under the care of a doctor or a psychiatrist or a

6     counselor, or anything of that sort?  Any kind of health

7     care provider?

8          THE DEFENDANT:  I went to the jail psychologist.

9          THE COURT:  A psychologist at the jail?

10          THE DEFENDANT:  Correct.

11          THE COURT:  Do you have a diagnosis from this

12     psychologist?

13          SPEAKING DIRECTLY:  I was prescribed an

14     antidepressant.

15          THE COURT:  Okay.

16          And what is the condition for which they prescribed

17     the antidepressants?  Depression?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Do you have any other mental conditions

20     other than depression?

21          THE DEFENDANT:  I do not.

22          THE COURT:  Okay.

23          How long -- what antidepressant do you take?

24          THE DEFENDANT:  Esperion, two weeks ago, is what it

25     is called.

```
1          THE COURT:  Okay.

2          How frequently do you take it?

3          THE DEFENDANT:  Once a day at night.

4          THE COURT:  You have been on it for two weeks; is

5     that correct?

6          THE DEFENDANT:  Correct.

7          THE COURT:  Have you noticed during those two weeks

8     that it has any effect on your ability to think and

9     understand things?

10         THE DEFENDANT:  It has not, no.

11         THE COURT:  To your knowledge are you able to

12    understand questions and answer them accurately?

13         THE DEFENDANT:  I am.

14         THE COURT:  All right.

15         Have you, other than that, those visits with the

16    doctor at the jail, have you had any other psychological

17    or psychiatric treatments in the past year?

18         THE DEFENDANT:  No, Your Honor.

19         THE COURT:  How about looking farther in the past?

20         MS GRADY:  I can short circuit, Judge.  He had an

21    attempt to harm himself when he was 19, which would have

22    been eight years ago.

23         THE COURT:  Okay.

24         And other than that attempt to harm yourself, have

25    you had any other similar psychological or mental
```

**J.A. 13**

1    situations?

2           THE DEFENDANT:  No, Your Honor.

3           THE COURT:  Okay.

4           Have you recently been in a hospital for any reason?

5    By recently, I mean in the past two years.

6           You can answer these questions -- it's not --

7           MS GRADY:  Yes, he had another attempt to harm

8    himself in the jail, Judge.  He was wondering the depth of

9    The Court's questions.

10          THE COURT:  So you made an attempt to harm yourself

11   in the jail.  When was that, sir?

12          THE DEFENDANT:  That was about a month and a half

13   ago.

14          THE COURT:  Tell me what you tried to do to harm

15   yourself at that time.

16          THE DEFENDANT:  I took about a hundred pills.

17          THE COURT:  You took a lot of pills.  Did you save up

18   your antidepressant pills to do that?

19          THE DEFENDANT:  They were like Tylenol from the

20   commissary.

21          THE COURT:  They were what?

22          THE DEFENDANT:  They were Tylenol from the

23   commissary.

24          THE COURT:  Okay.

25          And did you go to a hospital at that time?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  What hospital did you go to?  Was it --

3     the jail took you to a hospital?

4          THE DEFENDANT:  Correct.

5          THE COURT:  And did you receive any medication at

6     that time?

7          THE DEFENDANT:  I received some fluids to help

8     protect my liver.

9          THE COURT:  Okay.  Other than the fluids that you

10    received, did you receive any other kind of medicine at

11    that time?

12         THE DEFENDANT:  No, Your Honor.

13         THE COURT:  Other than receiving the fluids, did you

14    receive any treatment at that time?

15         THE DEFENDANT:  That is when I started seeing a

16    psychologist.

17         THE COURT:  Okay.  But they didn't -- did they pump

18    your stomach or anything at that point?

19         THE DEFENDANT:  No, sir.

20         THE COURT:  Okay.

21         Mr. Falte, other than that trip to the hospital have

22    you been to any other hospital in the past two years?

23         THE DEFENDANT:  No, Your Honor.

24         THE COURT:  All right.

25         Are you addicted to alcohol or drugs of any sort,

1    whether legal are illegal?

2        THE DEFENDANT:  I am not.

3        THE COURT:  Do you abuse alcohol or drugs of any

4    sort, whether legal or illegal?

5        THE DEFENDANT:  No.  I do not.

6        THE COURT:  Have you ever been treated for alcohol or

7    drug abuse?

8        THE DEFENDANT:  No, sir.

9        THE COURT:  Have you had anything of an alcoholic

10   nature to drink in the past two days?

11       THE DEFENDANT:  No, sir.

12       THE COURT:  Other than your antidepressants have you

13   had any drugs of any sort, including marijuana, in the

14   past two days?

15       THE DEFENDANT:  I have not.

16       THE COURT:  Ms Grady, do you have any doubts about

17   the defendant's competence or ability to understand

18   today's proceedings?

19       MS GRADY:  No, I do not, Your Honor.

20       THE COURT:  Mr. Falte, have you received a copy of

21   the information in this case, that is to say, the written

22   statement of the charges against you?

23       THE DEFENDANT:  I have, Your Honor.

24       THE COURT:  Did you read that?

25       THE DEFENDANT:  Yes, sir.

1        THE COURT:  Are you the person named in it?

2        THE DEFENDANT:  Yes, sir.

3        THE COURT:  Now, Mr. Falte, you have a right to be

4   indicted.  That means you can insist that the government

5   submit your case to what is called a grand jury.  A grand

6   jury is a group of people who would hear the evidence that

7   the prosecution has against you, and decide whether there

8   is a reasonable basis for the prosecution to continue.

9   You would not have a right to appear at the grand jury.

10  It is all the prosecution that would show up and they

11  would kind of summarize the evidence they have against

12  you.

13       If that happens, if they decide there is a reasonable

14  basis to prosecute you, the grand jury issues what is

15  called an indictment.  You, however, have been -- have

16  been charged with what is called an information.  An

17  information is analogous to a traffic ticket.  Have you

18  ever gotten a traffic ticket?

19       THE DEFENDANT:  I have.

20       THE COURT:  So you are out on the road, the officer

21  pulls you over, and the officer writes down the charges on

22  a summons and gives it to you.  And then you show up at

23  court later on.  This is similar to that in that the

24  prosecution writes up the charge, you are served with it,

25  and then you come to court and you have court proceedings

1    including, if necessary, a trial based on that.

2         You have every right to insist that your case be

3    submitted to a grand jury instead of going forward on an

4    information as they have in this case.

5         I have in front of me what appears to be a waiver of

6    indictment signed by you.  Did you sign that today?

7         THE DEFENDANT:  Correct, Your Honor.

8         THE COURT:  What?

9         THE DEFENDANT:  Correct.  Yes, sir.

10        THE COURT:  All right.

11        Did you, knowing that you have a right to insist that

12   you be indicted by a grand jury, is it still your desire

13   to go ahead and waive that right and proceed on an

14   information?

15        THE DEFENDANT:  Yes, Your Honor.

16        THE COURT:  All right.

17        I will then accept the waiver of indictment.

18        I will sign it and date it today.

19        All right.  Now, have you had a chance to discuss the

20   charges in your case with your attorney, Ms Grady?

21        THE DEFENDANT:  I have.

22        THE COURT:  Have you told her everything you know

23   about this case?

24        THE DEFENDANT:  I have.

25        THE COURT:  Because -- I ask you that question

1    because that is the best way that she can help you if you

2    are fully candid with her.  Do you understand that?

3         THE DEFENDANT:  I understand.

4         THE COURT:  All right.

5         Are you fully satisfied with the services and advice

6    that Ms Grady has provided to you?

7         THE DEFENDANT:  I am.

8         THE COURT:  Up to this date has she done everything

9    that you have asked her to do in the case?

10        THE DEFENDANT:  Yes, sir.

11        THE COURT:  Are there any questions that you have

12   asked her that she has not answered?

13        THE DEFENDANT:  There are none.

14        THE COURT:  All right.

15        Do you understand that you are charged with sexual

16   abuse of a minor?  Do you understand that that is the

17   charge you are facing in this case?

18        THE DEFENDANT:  I understand.

19        THE COURT:  Do you understand that while there is a

20   plea agreement in this case there is no agreement with

21   respect to sentencing, other than the fact that the

22   government will not request a sentence of longer than 50

23   years in this case?

24        Do you understand that?

25        THE DEFENDANT:  I understand, yes, sir.

1          THE COURT:  All right.

2          Do you understand that at the end of your case you

3    will have a sentencing proceeding if you continue to plead

4    guilty, and I will then impose the sentence?  Do you

5    understand that?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Do you understand that I am not bound by

8    anything other than the fact that there is a mandatory

9    minimum sentence of 30 years in this case?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  I have to sentence you more than 30

12    years, but I can sentence you anywhere up to life in

13    prison.  Do you understand that?

14          THE DEFENDANT:  I understand.

15          THE COURT:  All right.

16          So, the fact that the government might recommend 50

17    years is not binding on me.

18          Are you aware of that?

19          THE DEFENDANT:  I understand.

20          THE COURT:  All right.

21          Has Ms Grady gone over you what the government has to

22    prove for you to be found guilty of the charges in this

23    case?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  All right.

1          Now, I have in front of me a plea agreement which

2     appears to have your signature dated today on it.

3          Mr. Falte, have you read the plea agreement in this

4     case?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Is this your signature on page ten of the

7     plea agreement?

8          THE DEFENDANT:  It is.

9          THE COURT:  Did you go over the terms of the plea

10     agreement with your lawyer, Ms Grady?

11          THE DEFENDANT:  I did.

12          THE COURT:  Did she explain to you what it means?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Did you ask her any questions that you

15     had about it -- if you had any?

16          THE DEFENDANT:  If I had any, she answered them.

17          THE COURT:  If you asked her any questions did she

18     answer those questions?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  All right:

21          This is your signature on page ten; is that correct?

22          THE DEFENDANT:  Correct.

23          THE COURT:  All right.

24          I have also in front of me a statement of facts which

25     appears to have your signature on page three.  Did you

1    sign the signature of facts -- the statement of facts on

2    page three?

3           THE DEFENDANT:  I did, Your Honor.

4           THE COURT:  Did you read the statement of facts

5    before you signed it?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Did Ms Grady explain to you what it

8    means?

9           THE DEFENDANT:  She did.

10          THE COURT:  Did you ask her any questions that you

11   had about it?

12          THE DEFENDANT:  I did.

13          THE COURT:  Did she answer those questions?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  This is your signature on page three; is

16   that correct?

17          THE DEFENDANT:  Correct.

18          THE COURT:  Is this statement of facts true?

19          THE DEFENDANT:  It is.

20          THE COURT:  Is there anything that is untrue in this

21   statement of facts?

22          THE DEFENDANT:  There is not.

23          THE COURT:  All right.

24          This statement of facts that says, it says that you

25   came to Virginia twice; once in 2015 and at least once in

1   2015 and 2016, that you came here to have performed sexual

2   acts with a four-year-old minor.  Are you aware of that?

3        THE DEFENDANT:  I am.

4        THE COURT:  All right.

5        It says also that you came from a different state to

6   do that; is that correct?

7        THE DEFENDANT:  Correct.

8        THE COURT:  All right.

9        Are you pleading guilty because you are in fact

10  guilty of this offense?

11       THE DEFENDANT:  I am, Your Honor.

12       THE COURT:  What?

13       THE DEFENDANT:  Yes, sir.

14       THE COURT:  All right.

15       I am going to accept the guilty plea and statement of

16  facts.

17       Do you have the waiver of indictment?

18       THE CLERK:  Yes.

19       THE COURT:  All right.

20       Okay.  Now, did Ms Grady go over with you the

21  evidence that she believes the government could present in

22  this case against you if this case went to trial?

23       THE DEFENDANT:  Yes, sir.

24       THE COURT:  Did you tell her about any evidence that

25  you have in the case that you think is positive or

**J.A. 23**

1    negative as far as you are concerned?

2        THE DEFENDANT:  I did.

3        THE COURT:  All right.

4        This plea agreement that we have just talked about,

5    does that reflect the complete agreement that you have

6    with the prosecution?  Do you have any side deals that are

7    not written down?

8        THE DEFENDANT:  No, Your Honor.

9        MS ABER:  Your Honor, if I may interrupt for one

10   moment.  I agree there are no side deals, but Ms Britsch

11   is here with the Department of Justice, and they have

12   asked for the sake of the record that she be allowed to

13   indicate that this plea agreement is only as to the

14   Eastern District of Virginia, not to any other district.

15   If she could be afforded simply a moment to clarify what

16   is paragraph 9 of the plea agreement for the sake of the

17   record.

18       THE COURT:  Well, paragraph nine is pretty clear.  It

19   looks like he is going to be prosecuted in Tennessee as

20   well.

21       MS ABER:  I agree.  I just want to make clear at this

22   proceeding, both orally and in writing, that that is --

23   that this plea agreement only binds the Eastern District

24   and his pending charges in Tennessee have no bearing on

25   this.

**J.A. 24**

19

```
1          THE COURT:  Okay.

2          Ms Brisch, did you have anything to add?

3          MS BRITSCH:  Only, Your Honor, that any consideration

4   given by the government thus far only impacts the charges

5   here in the Eastern District of Virginia.  This plea

6   agreement and that consideration has no bearing on the

7   pending charges in the Middle District of Tennessee.

8          THE COURT:  Okay.

9          MS BRITSCH:  Thank you.

10         THE COURT:  Has he been indicted on those?

11         MS ABER:  He has, Your Honor.

12         THE COURT:  Has he been arraigned on those?

13         MS BRITSCH:  He has not, Your Honor.

14         THE COURT:  Okay.

15         How is that going to work?  Is this case going to be

16  completely finished before he goes to Tennessee?

17         MS BRITSCH:  I believe so.  That is the plan at this

18  time, Your Honor.

19         Thank you, Your Honor.

20         MS BRITSCH:  Thank you, Your Honor.

21         THE COURT:  Thank you, ma'am.

22         Now, Mr. Falte, do you understand that the government

23  reserves the right to prosecute you for offenses in

24  Tennessee arising from, I guess, different facts?

25         THE DEFENDANT:  I do.
```

**J.A. 25**

1          THE COURT:  All right.

2          Now, no side deals.

3          Has anybody made any promises to get you to plead

4    guilty, other than what is in the plea agreement?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  Has anybody made any threats against you

7    in order to get you to plead guilty?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  Other than the threat they would continue

10   to prosecute you?

11         THE DEFENDANT:  No, Your Honor.

12         THE COURT:  Okay.

13         Are you pleading guilty of your own free will?

14         THE DEFENDANT:  I am.

15         THE COURT:  All right.

16         Do you believe it is in your best interest to plead

17   guilty instead of going to trial?

18         THE DEFENDANT:  I do.

19         THE COURT:  Okay.

20         You understand that if I give you a harsher sentence

21   than you anticipate, you cannot change your plea of guilty

22   to not guilty?

23         THE DEFENDANT:  I understand.

24         THE COURT:  Mr. Falte, have you ever been been

25   convicted of a felony in the past?  A felony?

**J.A. 26**

1          THE DEFENDANT:  I have not.

2          THE COURT:  All right.

3          Do you understand that this is a felony in this case?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  And that has some effect on your civil

6     rights?

7          Such as, you can't have a gun, you cannot vote, you

8     cannot hold public office, and you cannot serve on a jury.

9          Do you understand that?

10          THE DEFENDANT:  I do.

11          THE COURT:  All right.

12          Okay.  Do you understand that the maximum punishment

13     for this offense is a life sentence of imprisonment?

14          THE DEFENDANT:  I do.

15          THE COURT:  Do you understand that there is a

16     mandatory sentence that you can't go below in this case of

17     30 years.  So, in other words, even if Ms Grady were to

18     try to persuade me otherwise at sentencing in this case,

19     your sentence will at least be 30 years?

20          THE DEFENDANT:  I understand.

21          THE COURT:  Do you understand that at the end of any

22     prison sentence that you receive in this case you will be

23     placed on something called supervised release for a term

24     of at least five years, and possibly life?

25          THE DEFENDANT:  I understand.

**J.A. 27**

1        THE COURT:  Do you also understand that you will be

2    required, upon your release from prison, to register as a

3    sex offender in any state in which you are living in which

4    they have a sex offender registration law?

5        THE DEFENDANT:  I do.

6        THE COURT:  All right.

7        Do you understand that you can also be fined up to a

8    quarter of a million dollars in this case?

9        THE DEFENDANT:  I do.

10        THE COURT:  All right.

11        Do you understand that as well you can be required to

12    provide restitution to the victim in this case?  In other

13    words, if this child you had sexual relations has, I don't

14    know, psychological harm or something like that, and has

15    medical bills or has other damages as a result of that,

16    one of the things that you could be required to do is to

17    pay those?

18        THE DEFENDANT:  I understand.

19        THE COURT:  All right.

20        Let me just explain to you what supervised release

21    is.  Supervised release means that when you get out of

22    prison you have to go to see a probation officer

23    periodically, and the probation officer will give you

24    certain directions, such as, you have to take drug tests,

25    you have to get a job, you have to stay away from places

1    where children are, and that sort of thing.  Do you

2    understand that those requirements will be imposed on you

3    and will be mandatory?  There will be other requirements

4    as well, and will be written out for you.  If you disobey

5    any of these you could be sent back to jail for an

6    additional time.

7         Do you understand that?

8         THE DEFENDANT:  I do.

9         THE COURT:  Okay.

10        In addition, you will be required to pay a mandatory

11   assessment of a hundred dollars in this case.  Do you

12   understand that?

13        THE DEFENDANT:  I understand.

14        THE COURT:  Do you understand that if it turns out

15   that you are not -- that you have assets, you can be made

16   to pay a mandatory assessment up to $5,000, and that is

17   due whether or not I impose a fine in this case?

18        THE DEFENDANT:  I do.

19        THE COURT:  Okay.

20        Other than the charges in Tennessee do you have any

21   other charges pending against you anywhere else at this

22   time?

23        THE DEFENDANT:  I do not.

24        THE COURT:  Are you out on bond from anyplace at this

25   time?

1        THE DEFENDANT:  No, sir.

2        THE COURT:  Are you on probation for any offenses at

3   this time?

4        THE DEFENDANT:  No, sir.

5        THE COURT:  Do you have what is called a suspended

6   sentence from any other jurisdiction at this time?

7        THE DEFENDANT:  I do not.

8        THE COURT:  Okay.

9        Have you and Ms Grady discussed the Federal

10  Sentencing Guidelines?

11       THE DEFENDANT:  Yes, Your Honor.

12       THE COURT:  All right.

13       The Federal -- here is what the Federal Sentencing

14  Guidelines are.  The Federal Sentencing Guidelines take a

15  look at you and your past record and what kind of person

16  you are.  And they take a look at your offense.

17       And they have a chart, and they try to figure out a

18  suggested sentence for me.  And the suggested sentence is

19  a range.  It is a range of months.  So, for instance, if

20  it was -- it might be 240 to 270 months, which would be --

21  and would suggest I sentence you somewhere in that range.

22       Do you understand that that is how the guidelines

23  work?

24       THE DEFENDANT:  I do, Your Honor.

25       THE COURT:  Do you understand that I can impose a

1    sentence that is greater or lesser than the guidelines?

2    In other words, the guidelines are a suggestion to me and

3    are not binding on me.

4        THE DEFENDANT:  I understand.

5        THE COURT:  Do you understand that before we sentence

6    you at all in this case The Court has to compute the

7    guideline sentence that is suggested?

8        THE DEFENDANT:  I do, Your Honor.

9        THE COURT:  Now, Ms Grady is one of the best lawyers

10   that practices in this court.  And I am sure she has given

11   you an estimate of where your guideline will come out.

12   You need to understand that until a probation officer

13   prepares a presentence report and does this formal

14   calculation of the guideline sentence range that I just

15   discussed with you, until that happens the best Ms Grady

16   or anybody can give you is an educated estimate of what

17   your guideline sentencing range will be.

18       I know Ms Grady well, and she practiced her in front

19   of me for six years now.  And I am sure that her estimate

20   is very close to exactly what the guideline suggested

21   range would be.  But until that suggested range is

22   calculated by a probation officer and accepted by The

23   Court nobody can tell you exactly what your guideline

24   sentence range will be.

25       Do you understand that?

26

1        THE DEFENDANT:  I do, Your Honor.

2        THE COURT:  All right.

3        You will have the right when the presentence report

4    is prepared to tell Ms Grady if there is anything that you

5    think is inaccurate in it.  You would have the right to

6    meet with the probation officer before the presentence

7    report is prepared to give the probation officer facts

8    about you and your life, and then to come and tell me if

9    there is anything that is inaccurate in that presentence

10   report, including the calculation of the guidelines.  The

11   government will also have the right to contest anything

12   that is in the presentence report.  I am counting on you

13   to take a look at that and to read it closely and to alert

14   Ms Grady to anything that is in the presentence report

15   that is inaccurate.

16       Do you understand that I am counting on on you to do

17   that?

18       THE DEFENDANT:  Yes, sir.

19       THE COURT:  All right.

20       In addition to the presentence report I will consider

21   the factors that are set forth in the United States Code

22   that I am required to consider in imposing a sentence on

23   you.  I am going to tell you what they are now so that you

24   will know what I am thinking about when I impose a

25   sentence in this case.  The first factor is the nature and

**J.A. 32**

1  circumstances of the offense.  In other words, what
2  happened.
3      The second factor is the history and characteristics
4  of the defendant.  In other words, what kind of person you
5  are.
6      The sentence that I impose must consider the
7  seriousness of the offense and must provide just
8  punishment.
9      It must deter people from the committing this
10 offense.  In other words, when people out on the street
11 and in the public hear about the sentence that you
12 received in this case it must be of a sufficient nature
13 they will say that they don't want to commit that offense.
14     It also must deter you from committing similar
15 offenses in the future.
16     The sentence that I impose must protect the public
17 from further crimes by you.
18     I must consider the ability of our correctional
19 system to provide you with education or vocational
20 training, medical care, or other correctional treatment.
21     I will consider the kinds of sentences available, the
22 length of sentence given to other people for similar
23 crime.
24     The need to provide restitution to victims of your
25 offense.

1          And, as I said earlier, I will consider the Federal

2    Sentencing Guidelines.

3          I will take into account all of those factors and try

4    to come up with a sentence that is adequate but not longer

5    than necessary to address each of them.

6          Do you understand that I will consider all of those

7    factors in sentencing you?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Do you understand that parole is

10   abolished, and if you are sent to prison you will not be

11   released early on parole?

12         THE DEFENDANT:  I do.

13         THE COURT:  Do you understand in your plea agreement

14   you have given up your right to appeal any sentence that

15   is within the statutory limits in this case?

16         Do you understand that?

17         THE DEFENDANT:  I do.

18         THE COURT:  Do you understand that if the government

19   doesn't like the sentence I impose the government can

20   appeal the sentence?

21         THE DEFENDANT:  I do.

22         THE COURT:  All right.

23         By pleading guilty you are giving up some very

24   significant Constitutional rights that you have in our

25   country.  One of your rights is the right to plead not

**J.A. 34**

1    guilty, go to trial, and then insist that the government
2    prove you guilty beyond a reasonable doubt.

3        If you go to trial the government has to prove every
4    fact, every element, every part of the charge against you
5    beyond a reasonable doubt.  You do not have to prove
6    anything.  You do not have to testify.  You do not have to
7    call witnesses.  You do not have to produce documents or
8    pictures or any other kind of evidence.  You do not have
9    to call character witnesses.  The reason is that you are
10   presumed innocent at every stage of the case.  That
11   presumption of innocence is with you at every stage of the
12   case, and it is enough to have you found not guilty if the
13   government does not prove you guilty beyond a reasonable
14   doubt.

15       Nobody could stand up and argue to me, or to anybody
16   else, if do you not testify or do not call witnesses or do
17   not produce evidence, nobody can say Mr. Falte must be
18   guilty because he didn't testify.  He didn't tell us his
19   side of the story.  Nobody can make any kind of argument
20   like that.  And if your lawyer asked me, I would tell the
21   jury in this case if we had a jury that they cannot hold
22   your silence against you.  But you have given up those
23   rights.

24       Do you understand that?

25       THE DEFENDANT:  I understand.

**J.A. 35**

1          THE COURT:  You are entitled to a lawyer to represent

2     you at every stage of the case.  And I take it that you

3     are without funds, and The Court has already appointed Ms

4     Grady to represent you.  If you, even if you win the

5     lottery you are entitled to a lawyer in this case, and if

6     you continue to be unable to afford one, Ms Grady would

7     continue to be your lawyer in this case at every stage of

8     the proceedings.

9          You would have the right to subpoena witnesses.  That

10     means that you can ask The Court to enter an order telling

11     people they have to come to court and testify, and they

12     can't get out of it.  You would have a right to see and

13     hear all of the witnesses who testify against you.  And

14     Ms Grady would have the opportunity to ask them questions.

15     That is called cross examination.

16          In addition, you would have the right to see any

17     document that the government would introduce against you,

18     or any photographs, or anything else before the jury or I

19     see them.  And Ms Grady would have the opportunity to make

20     an appropriate objection so that they are not considered

21     by me or the jury.

22          But once again, you have given up those rights.

23          Do you understand that?

24     THE DEFENDANT:  I do.

25     THE COURT:  You would have a right to be tried by a

**J.A. 36**

1    jury of 12 people.  The jury would have to vote

2    unanimously to find you guilty.  That means that every

3    single juror would have to believe that you have been

4    proved guilty beyond a reasonable doubt before they can

5    convict you in this case.  Now, in some cases they could

6    try you again.  But if a single juror thinks you are not

7    guilty, they cannot convict you.  But you have given up

8    those rights as well.

9        Do you understand that?

10        THE DEFENDANT:  I do.

11        THE COURT:  As I said to you earlier, you give up the

12    right to remain silent by pleading guilty.  The government

13    can summons you and ask you questions before a court or a

14    grand jury, and you have to answer those as long as they

15    do not open you up to additional charges or additional

16    punishment.

17        Now, just looking at the file in this case it appears

18    that you were involved in the internet in this case in

19    finding the victim in this case, and possibly in other

20    matters.  That means that the government can make you get

21    on the stand and testify about other people who you might

22    know who were involved in similar activity.

23        Do you understand that they can make you do that?

24        THE DEFENDANT:  I do.

25        THE COURT:  All right.

1          Do you understand that by pleading guilty you are

2     giving up all of these rights and there will be no trial

3     at all?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  All right.

6          You are charged with aggravated sexual abuse of a

7     minor.  In order to prove you guilty of that the

8     government has to prove that you crossed a state line in

9     order to engage in a sexual act with a person under the

10    age of 12 years.  And, that you knowingly engaged or

11    attempted to engage in a sexual act with a person under

12    the age of 12 years.  Do you agree that the government

13    could prove each of those facts, Mr. Falte?

14         THE DEFENDANT:  I do.

15         THE COURT:  All right.

16         Mr. Falte, you have been very cooperative today.  I

17    certainly appreciate that.  Is there anything I have asked

18    you that you did not understand today?

19         THE DEFENDANT:  No, sir.

20         THE COURT:  Do you have any questions that you want

21    to ask me about your rights or the charges against you or

22    the sentencing procedures, or any other matters that we

23    have covered today?

24         THE DEFENDANT:  I do not.

25         THE COURT:  Do you need any additional time to talk

**J.A. 38**

1    to Ms Grady, your attorney, before entering your plea?

2        THE DEFENDANT:  No, sir.

3        THE COURT:  Ms Grady, are you aware of any reason The

4    Court should not accept his plea at this time?

5        MS GRADY:  I am not aware of anything, Your Honor.

6        THE COURT:  All right.

7        Are you ready to enter your plea, Mr. Falte?

8        THE DEFENDANT:  I am.

9        THE COURT:  All right.

10       Face the clerk, please.

11       THE CLERK:  Patrick Falte, you understand the count

12   pending against you in the criminal information.  I ask

13   you now, what is your plea, guilty or not guilty, as to

14   count one?

15       THE DEFENDANT:  Guilty.

16       THE COURT:  All right.

17       Mr. Falte, thank you very much.  You may be seated.

18       It is finding of The Court in the case of the United

19   States versus Patrick Falte that Mr. Falte is fully

20   competent and capable of entering an informed plea, that

21   he is aware of the nature of the charges and consequences

22   of the plea, that the plea of guilty is a knowing and

23   voluntary plea, that the plea is supported by an

24   independent factual basis containing each of the essential

25   elements of the offense.  His plea is therefore accepted,

1    and he is now adjudged guilty of that offense.

2        Mr. Falte, as I mentioned earlier, a presentence

3    report will be prepared in this case.  You will have the

4    opportunity to meet with the probation officer, and Ms

5    Grady will have the opportunity to be there with you to

6    provide information to you in that presentence report.

7    That is a pretty important step, a chance to put your best

8    foot forward in this case in sentencing.  So I urge you to

9    cooperate pretty fully in that process.  Again, I urge

10   you, one of your jobs is to let me know if there is

11   anything that is inaccurate in that.

12       I strongly urge you to cooperate fully in that

13   process.

14       At sentencing in this case Ms Grady will have the

15   opportunity to get up and make an argument or a speech on

16   your behalf as to what sentence I should impose in this

17   case.

18       You also will have a chance to get up and to address

19   me.  I strongly urge you to do that, because that is -- I

20   don't get to know you as a person very well.  And that

21   will be one of the ways in which I will understand that

22   you are a human, and what factors there are I should

23   consider in your life in sentencing you.

24       So I strongly urge you to make statement to me when

25   we sentence you in this case.  I strongly urge you as well

1    to go over your statement, what you are going to say, with

2    Ms Grady before you say it so you don't accidentally harm

3    yourself in some way.  And practice it before you come to

4    court because you will be nervous that day.  I don't want

5    you to mess up.  You might even make notes that you can

6    follow.

7         All right.

8         Let's set this case for something.  Ms Grady, do you

9    need a little extra time in this case to possibly think

10   about mitigation evidence?

11        MS GRADY:  I think I need a little bit more time only

12   because of my schedule in the next three weeks might delay

13   the presentence report, which in turn would delay

14   everything else as well, Judge.  So I would like maybe an

15   additional month to early September, or last week in

16   August.  Ninety days would be August ten.  And so maybe

17   last week in August or --

18        THE COURT:  Well, okay.

19        That is a tough time for me.  I have got a pretty big

20   criminal trial coming up then.

21        MS GRADY:  First week in September.

22        THE COURT:  First week in September.  You would need

23   to get permission from my spouse to have a sentencing to

24   have me here in Richmond at that time.

25        MS GRADY:  I think we will by-pass that assignment.

1          THE COURT:  I am glad.  You will by-pass it, and I

2    will by-pass it, too.  How about the 25th of December or

3    26th?

4          MS GRADY:  You said "December."

5          THE COURT:  What did I say?

6          MS GRADY:  December.  I was thinking that as a lot of

7    time.

8          THE COURT:  September.  I am thinking of, now I am

9    thinking of a song by Earth Wind and Fire.

10          How about September?

11          MS GRADY:  That date is fine with me.

12          MS ABER:  The government is available on the 26th,

13    but not the 25th.

14          THE COURT:  Twenty-sixth all right.

15          MS ABER:  Yes.

16          THE COURT:  All right.

17          Are you okay on that, Ms Britsch?

18          MS BRITSCH:  I am, Your Honor.

19          THE COURT:  I am not saying that right. Is it

20    Britsch?

21          MS BRITSCH:  It is Britsch.

22          THE COURT:  Had it right the first time.

23          MS BRITSCH:  That is good for me as well.

24          THE COURT:  All right with you?

25          MS GRADY:  Fine with me.

**J.A. 42**

```
1          THE COURT:  9:00 o'clock on the 26th.

2          I understand we have a co-defendant who is going to

3     plead next week in this case.

4          MS GRADY:  That's correct, Your Honor.

5          THE COURT:  That would be Mr. Faulkner.

6          MS GRADY:  Yes, Your Honor.

7          THE COURT:  Where is he housed?  At the same place as

8     Mr. Falte?

9          MS GRADY:  That is my understanding.

10         That is true, Judge.  Yes.  In Northern Neck.

11         THE COURT:  Any problem with doing those the same day

12    as Mr. Faulkner.  Is his lawyer available?

13         MS ABER:  No objection from the government.

14         MS GRADY:  I don't think I have any objection at this

15    time.

16         THE COURT:  The offenses are not pleasant ones, and I

17    don't want to sort of look like we are piling on.

18         MS GRADY:  I don't want to merge them.  They have

19    defendant levels.  I wouldn't say culpability, but

20    certainly different actions.  And I would --

21         THE COURT:  We will schedule his when we get around

22    to scheduling.  Okay.  All right.

23         He is coming in next week?

24         MS ABER:  Yes, next week.

25         THE COURT:  Are you coming down again?
```

**J.A. 43**

38

1         MS BRITSCH:  I will not.  I have another indictment

2    in Oregon, so I won't be present.

3         THE COURT:  When is it -- tell me your job in the

4    Justice Department.  Do you deal with these kinds of cases

5    all the time?

6         MS BRITSCH:  Yes, Your Honor.  I am assigned to the

7    child exploitation section, so I work exclusively, child

8    sexual abuse and child pornography cases all over the

9    country.

10        THE COURT:  And you do that all the time?

11        MS BRITSCH:  Yes, Your Honor.

12        THE COURT:  Do you actually -- when and if those

13   cases go to trial do you participate in the trial?

14        MS BRITSCH:  I do, Your Honor.  If our office is

15   involved in the investigation and handling the charging,

16   yes, we would also be involved in the trial.

17        THE COURT:  Do you do something to take care of

18   yourself?

19        MS BRITSCH:  Yes, Your Honor, I think it is mostly

20   about camaraderie among my colleagues.  We deal with this

21   every day.  But I have learned to exercise as much as

22   possible.

23        THE COURT:  Okay.

24        Well, you need to get your brain away from this sort

25   of thing.

**J.A. 44**

```
1          MS BRITSCH:  Yes, Your Honor.

2          THE COURT:  All right.

3          Mr. Falte, I well see you in September, sir.  Good

4     luck until that time, sir.

5          THE DEFENDANT:  Thank you.

6          THE COURT:  Let's recess court.

7

8                          HEARING ADJOURNED

9

10         The foregoing is a true and correct transcript.

11

12                  Gilbert Frank Halasz, RMR

13                  Official Court Reporter:

14

15

16

17

18

19

20

21

22

23

24

25
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 3:17CR49

PATRICK FALTE



## WAIVER OF INDICTMENT

I, Patrick Falte, the above named defendant, who is accused of a violation of Title 18:2241(c), being advised of the nature of the charge(s), the proposed Information, and of my rights, hereby waive in open court on May 10, 2017 prosecution by Indictment and consent that the proceeding may be by Information rather than Indictment.

_____
**Defendant**

_____
**Counsel for Defendant**

5/10/17 /s/ _____
John A. Gibney, Jr.
United States District Judge

**J.A. 46**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA    )
                            )
           v.               )    No. 3:17cr49
                            )
PATRICK FALTE,              )
                            )
           Defendant.       )

**F I L E D**

**MAY 1 0 2017**

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## PLEA AGREEMENT

Dana J. Boente, United States Attorney for the Eastern District of Virginia; Jessica D. Aber, Assistant United States Attorney; the defendant, PATRICK FALTE, and the defendant's counsel have entered into an agreement pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure. The terms of the agreement are as follows:

### 1.    Offense and Maximum Penalties

The defendant agrees to waive indictment and plead guilty to a single count criminal information charging the defendant with Aggravated Sexual Abuse of a Minor, in violation of Title 18, United States Code, Section 2241(c). The maximum penalties for this offense are a mandatory minimum term of imprisonment of 30 years, a maximum term of life imprisonment, a fine of $250,000, full restitution, special assessments pursuant to 18 U.S.C. § 3013 and 3014, and a supervised release term of not less than five years or life. The defendant understands that this supervised release term is in addition to any prison term the defendant may receive, and that a violation of a term of supervised release could result in the defendant being returned to prison for the full term of supervised release.

J.A. 47

**2.      Factual Basis for the Plea**

The defendant will plead guilty because the defendant is in fact guilty of the charged offense. The defendant admits the facts set forth in the statement of facts filed with this plea agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable doubt. The statement of facts, which is hereby incorporated into this plea agreement, constitutes a stipulation of facts for purposes of Section 1B1.2(c) of the Sentencing Guidelines.

**3.      Assistance and Advice of Counsel**

The defendant is satisfied that the defendant's attorney has rendered effective assistance. The defendant understands that by entering into this agreement, defendant surrenders certain rights as provided in this agreement. The defendant understands that the rights of criminal defendants include the following:

a.      the right to plead not guilty and to persist in that plea;

b.      the right to a jury trial;

c.      the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings; and

d.      the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

**4.      Role of the Court and the Probation Office**

The defendant understands that the Court has jurisdiction and authority to impose any sentence within the statutory maximum described above but that the Court will determine the defendant's actual sentence in accordance with 18 U.S.C. § 3553(a). The defendant understands that the Court has not yet determined a sentence and that any estimate of the advisory sentencing

2

range under the U.S. Sentencing Commission's Sentencing Guidelines Manual the defendant may have received from the defendant's counsel, the United States, or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court. Additionally, pursuant to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), may impose a sentence above or below the advisory sentencing range, subject only to review by higher courts for reasonableness. The United States makes no promise or representation concerning what sentence the defendant will receive, and the defendant cannot withdraw a guilty plea based upon the actual sentence.

Further, in accordance with Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States will recommend a sentence of no greater than 50 years of imprisonment.

5.   **Waiver of Appeal, FOIA and Privacy Act Rights**

The defendant also understands that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Nonetheless, the defendant knowingly waives the right to appeal the conviction and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatsoever other than an ineffective assistance of counsel claim that is cognizable on direct appeal, in exchange for the concessions made by the United States in this plea agreement. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b). The defendant also hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation

3

J.A. 49

any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

### 6.    Special Assessment

Before sentencing in this case, the defendant agrees to pay a mandatory special assessment of $100 per count of conviction.

The defendant understands and agrees that, pursuant to 18 U.S.C. § 3014, if the Court should find that the defendant is non-indigent, the Court shall assess a special assessment of $5,000 per count of conviction on the defendant.  However, the special assessment shall not be payable until the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim compensation arising from the criminal convictions on which the special assessment is based.

### 7.    Payment of Monetary Penalties

The defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for in Section 3613.  Furthermore, within 14 days of a request, the defendant agrees to provide all of the defendant's financial information to the United States and the Probation Office and, if requested, to participate in a pre-sentencing debtor's examination and/or complete a financial statement under penalty of perjury.  If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment.  If the defendant is incarcerated, the defendant agrees to voluntarily participate in the Bureau of Prisons' Inmate Financial

Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

**8. Restitution**

Pursuant to 18 U.S.C. § 2248, Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses. Defendant acknowledges that pursuant to 18 U.S.C. § 2248, the Court is required to order restitution for the full amount of the victims' compensable losses as defined at 18 U.S.C. § 2248(b)(3), as may be proved by the United States or stipulated to by the parties. Defendant acknowledges that the Court may not decline to award restitution because of the defendant's economic circumstances or the fact that the victims have, or are entitled to, receive compensation for their injuries from the proceeds of insurance or any other source.

Defendant understands that an unanticipated amount of a restitution order will not serve as grounds to withdraw defendant's guilty plea. Defendant further agrees to comply with any restitution order entered into at the time of sentencing. Defendant further agrees that defendant will not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding. Defendant agrees to make full restitution for the provable losses caused by defendant's activities. Defendant further agrees to grant the United States a wage assignment, liquidate assets, or complete any other tasks which will result in immediate payment in full, or payment in the shortest time in which full payment can be reasonably made as required under 18 U.S.C. § 3572(d).

Defendant further agrees to make full and accurate disclosure of his financial affairs to the United States. Specifically, Defendant agrees that, before sentencing, Defendant shall provide to the United States, under penalty of perjury, a financial statement which shall identify all assets owned or held directly or indirectly by Defendant. Defendant shall also identify all

assets valued at more than $5,000 which have been transferred to third parties since October 4, 2016, including the location of the assets and the identity of the third parties.

The parties will jointly recommend that as a condition of probation or supervised release, Defendant will notify the Financial Litigation Unit, United States Attorney's Office, of any interest in property obtained, directly or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership or corporation after the execution of this agreement until the fine or restitution is paid in full. See 18 U.S.C. § 3664(k), (n).

The parties will also jointly recommend that as a condition of probation or supervised release, Defendant will notify the Financial Litigation Unit, United States Attorney's Office, before Defendant transfers any interest in property owned directly or indirectly by Defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations. See 18 U.S.C. § 3664(k), (n).

The defendant further agrees that whatever monetary penalties are imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for in 18 U.S.C. § 3613. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment." If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

6

9.    **Immunity from Further Prosecution in this District**

The United States will not further criminally prosecute the defendant in the Eastern

District of Virginia for the specific conduct described in the information or statement of facts.

This agreement only binds the U.S. Attorney's Office for the Eastern District of Virginia and

does not bind the U.S. Attorney's Office for the Middle District of Tennessee or any other

component of the Department of Justice.

10.    **Sex Offender Registration and Notification Act**

The defendant has been advised, and understands, that under the Sex Offender

Registration and Notification Act, a federal law, the defendant must register and keep the

registration current in each of the following jurisdictions: where the defendant resides; is an

employee; or is a student. The defendant understands that the requirements for registration

include providing true name, residence address, and names and addresses of any places where

the defendant is or will be an employee or a student, among other information. The defendant

further understands that the requirement to keep the registration current includes informing at

least one jurisdiction in which the defendant resides, is an employee, or is a student not later than

three business days after any change of the defendant's name, residence, employment, or student

status. The defendant has been advised, and understands, that failure to comply with these

obligations subjects the defendant to prosecution for failure to register under federal law, 18

U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

11.    **Breach of the Plea Agreement and Remedies**

This agreement is effective when signed by the defendant, the defendant's attorney, and

an attorney for the United States. The defendant agrees to entry of this plea agreement at the

date and time scheduled with the Court by the United States (in consultation with the defendant's

7

J.A. 53

attorney).  If the defendant withdraws from this agreement or commits or attempts to commit any additional federal, state or local crimes, or intentionally gives materially false, incomplete, or misleading testimony or information, or otherwise violates any provision of this agreement, then:

    a.    The United States will be released from its obligations under this agreement, including any obligation to seek a downward departure or a reduction in sentence.  The defendant, however, may not withdraw the guilty plea entered pursuant to this agreement;

    b.    The defendant will be subject to prosecution for any federal criminal violation, including, but not limited to, perjury and obstruction of justice, that is not time-barred by the applicable statute of limitations on the date this agreement is signed.  Notwithstanding the subsequent expiration of the statute of limitations, in any such prosecution, the defendant agrees to waive any statute-of-limitations defense; and

    c.    Any prosecution, including the prosecution that is the subject of this agreement, may be premised upon any information provided, or statements made, by the defendant, and all such information, statements, and leads derived therefrom may be used against the defendant.  The defendant waives any right to claim that statements made before or after the date of this agreement, including the statement of facts accompanying this agreement or adopted by the defendant and any other statements made pursuant to this or any other agreement with the United States, should be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f),

8

J.A. 54

the Sentencing Guidelines or any other provision of the Constitution or federal law.

Any alleged breach of this agreement by either party shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall be admissible and at which the moving party shall be required to establish a breach of the plea agreement by a preponderance of the evidence.

### 12.  Nature of the Agreement and Modifications

This written agreement constitutes the complete plea agreement between the United States, the defendant, and the defendant's counsel. The defendant and the defendant's attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in writing in this plea agreement, to cause the defendant to plead guilty. Any modification of this plea agreement shall be valid only as set forth in writing in a supplemental or revised plea agreement signed by all parties.

Dana J. Boente
United States Attorney

By: _Jessica D. Aber_
Jessica D. Aber
Assistant United States Attorney

Lauren Britsch
Special Assistant United States Attorney

Elham Peirson
Trial Attorney
United States Department of Justice,
Child Exploitation and Obscenity Section

J.A. 55

    <u>Defendant's Signature</u>:  I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending criminal information.  Further, I fully understand all rights with respect to Title 18, United States Code, Section 3553 and the provisions of the Sentencing Guidelines Manual that may apply in my case.  I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand this agreement and voluntarily agree to it.

Date: _5/1E/17_      _____

                                    Patrick Falte
                                    Defendant

    <u>Defense Counsel Signature</u>:  I am counsel for the defendant in this case.  I have fully explained to the defendant the defendant's rights with respect to the pending information.  Further, I have reviewed Title 18, United States Code, Section 3553 and the Sentencing Guidelines Manual, and I have fully explained to the defendant the provisions that may apply in this case.  I have carefully reviewed every part of this plea agreement with the defendant.  To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one.

Date: _5/10/17_      _____

                                      Carolyn V. Grady, Esq.
                                    Counsel for the Defendant

**J.A. 56**

**U. S. DEPARTMENT OF JUSTICE**
Statement of Special Assessment Account

This statement reflects your special assessment only. There may be other penalties imposed at sentencing.

| ACCOUNT INFORMATION | |
|---|---|
| CRIM. ACTION NO.: | 3:17cr49 |
| DEFENDANT'S NAME: | Patrick Falte |
| PAY THIS AMOUNT: | $100 |

INSTRUCTIONS:

1. **MAKE CHECK OR MONEY ORDER PAYABLE TO:**
   *CLERK, U.S. DISTRICT COURT*

2. **PAYMENT MUST REACH THE CLERK'S OFFICE BEFORE YOUR SENTENCING DATE**

3. **PAYMENT SHOULD BE SENT TO:**

| | In person (9 AM to 4 PM) | By mail: |
|---|---|---|
| **Alexandria cases:** | | Clerk, U.S. District Court<br>401 Courthouse Square<br>Alexandria, VA 22314 |
| **Richmond cases:** | | Clerk, U.S. District Court<br>701 East Broad Street, Suite 3000<br>Richmond, VA 23219 |
| **Newport News cases:** | | Clerk, U.S. District Court<br>2400 West Ave, Ste 100<br>Newport News, VA 23607 |
| **Norfolk cases:** | | Clerk, U.S. District Court<br>600 Granby Street<br>Norfolk, VA 23510 |

4. **INCLUDE DEFENDANT'S NAME ON CHECK OR MONEY ORDER**

5. **ENCLOSE THIS COUPON TO ENSURE PROPER and PROMPT APPLICATION OF PAYMENT**

J.A. 57

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA        )
                                )
        v.                      )        No. 3:17cr __49__
                                )
PATRICK FALTE,                  )
                                )
        Defendant.              )

**STATEMENT OF FACTS**

The United States and the defendant stipulate that the following facts are true, and had

this matter proceeded to trial the United States could have proven them beyond a reasonable

doubt:

1.      On or about September 30, 2016, in Eastern District of Virginia and elsewhere,

the defendant, PATRICK FALTE, did cross a State line with the intent to engage in a sexual act,

as defined in 18 U.S.C. § 2246(2), with a person who has not attained the age of 12 years, all in

violation of Title 18, United States Code, Section 2241(c).

2.      At all times relevant to the Information, PATRICK FALTE was an individual

residing outside of the Commonwealth of Virginia.

3.      On or about September 30, 2016, FALTE left that state and traveled to a residence

in the Eastern District of Virginia. He met BENJAMIN FAULKNER—with whom he was

previously acquainted—at that location.

4.      On or about October 1, 2016, FALTE traveled with FAULKNER to another

residence in the Eastern District of Virginia for the purpose of sexually abusing a four-year-old

minor there. FALTE and FAULKNER previously had communicated with the minor's adult

custodian through an online chat program and agreed upon their visit for this purpose.

1

**J.A. 58**

5.    On at least other two occasions between the fall of 2015 through July 2016,

FALTE traveled from outside of the Commonwealth of Virginia to the Eastern District of

Virginia for the purpose of sexually abusing the same minor.  During these visits, FALTE

engaged in sexual acts, as defined in 18 U.S.C. § 2246(2), and production of child pornography

with the minor.

6    As part of his guilty plea, the defendant acknowledges that he committed the

above conduct knowingly and intentionally, not by accident or mistake, and that he knew his

conduct was illegal at the time.


                         Dana J. Boente
                         United States Attorney


                    By: _Jessica D. Aber_____
                         Jessica D. Aber
                         Assistant United States Attorney

                         Lauren Britsch
                         Special Assistant United States Attorney

                         Elham Peirson
                         Trial Attorney
                         United States Department of Justice,
                         Child Exploitation and Obscenity Section


2

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, PATRICK FALTE, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

PATRICK FALTE
Defendant

I am PATRICK FALTE's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Carolyn V. Grady
Counsel for Defendant

3

**J.A. 60**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:17cr49 |
| | ) | |
| PATRICK FALTE, | ) | |
| | ) | |
| Defendant. | ) | |

### MOTION PURSUANT TO U.S.S.G. § 3E1.1(B)

The United States of America, through its attorneys, Dana J. Boente, United States

Attorney, Jessica D. Aber, Assistant United States Attorney; Lauren Britsch, Special Assistant

United States Attorney; and Elham Peirson, Trial Attorney, moves this Court pursuant to

U.S.S.G. § 3E1.1(b) to grant an additional one-level reduction in the defendant's offense level

for acceptance of responsibility.    The Government states that the defendant has assisted

authorities in the investigation and prosecution of his own misconduct by timely notifying the

United States of the defendant's intention to enter a plea of guilty, thereby permitting the United

States to avoid preparing for trial and permitting the United States and the court to allocate their

resources efficiently.

J.A. 61

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

_____/s/_____
Jessica D. Aber
Assistant United States Attorney

Lauren Britsch
Special Assistant United States Attorney

Elham Peirson
Trial Attorney
United States Department of Justice,
Child Exploitation and Obscenity Section

United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: jessica.d.aber@usdoj.gov

2

**J.A. 62**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2017, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

all counsel of record.

<div style="margin-left: 40%;">

_____/s/_____
Jessica D. Aber
Virginia Bar No. 72680
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: jessica.d.aber@usdoj.gov

</div>

**J.A. 63**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:17cr49 |
| | ) | |
| PATRICK FALTE, | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Dana J. Boente, United States

Attorney, Jessica D. Aber, Assistant United States Attorney; Lauren Britsch, Special Assistant

United States Attorney; and Elham Peirson, Trial Attorney, hereby submits its position with

respect to sentencing for the defendant, Patrick Falte.  The United States has reviewed the

Presentence Investigation Report (PSR) and does not dispute any of the facts or factors set out

therein. The United States concurs with the probation officer's determination that the defendant's

Total Offense Level is 43 and that his Criminal History Category is I.  *See* Presentence Report

("PSR") ¶¶ 74-75. The defendant's applicable guideline range is life imprisonment, with a

mandatory minimum term of imprisonment of 30 years.  *Id.*

Based on the factors set out in 18 U.S.C. § 3553(a), and for the reasons set forth below

and the supplemental information submitted to this Court under seal, the United States

recommends a sentence of 50 years' (600 months) imprisonment.

**J.A. 64**

## I. Background

On October 4, 2016, the defendant and co-defendant Benjamin Faulkner (3:17cr45) were arrested on Criminal Complaints, alleging aggravated sexual abuse of a minor, in violation of 18 U.S.C. § 2241(c).  On May 10, 2017, the defendant pleaded guilty to a one-count Criminal Information charging him with Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241(c).

As outlined in his Statement of Facts and further explained in the PSR, the defendant and Mr. Faulkner met while administering a website dedicated to the advertisement and distribution of child pornography.[1]  They struck up a friendship online and became acquainted with a user of the website, Thomas Hix.  Sometime during 2015, Mr. Hix offered the defendant and Mr. Faulkner the use of a four-year-old child for their sexual gratification.[2]

The defendant traveled to the Eastern District of Virginia *three* times to sexually abuse the minor, who was only three years old at the time of the first visit in late 2015.  PSR ¶¶ 16, 19. Mr. Faulkner joined him for two of the trips.  During at least two of the trips, the defendant filmed his sexual abuse of the minor and then later uploaded these photographs to his child pornography website.

---

[1]     The defendant and Mr. Faulkner have been charged in the United States District Court for the Middle District of Tennessee for their roles in this website.  *See* PSR ¶ 4.

[2]     On or about October 4, 2016, Mr. Hix was charged by criminal complaint in the United States District Court for the Eastern District of Virginia with selling a child, in violation of 18 U.S.C. § 2251A.  *See United States v. Hix*, 1:16mj450.  Mr. Hix has not yet made an appearance on that charge.  He is presently in the custody of Prince William County, Virginia, where he has pleaded guilty to three counts of object sexual penetration and two counts of production of child pornography.  Mr. Hix will be sentenced on November 17, 2017.

**J.A. 65**

## II.  Position on Sentencing and Argument

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step

process.  First, the court must correctly determine, after making appropriate findings of fact, the

applicable guideline range."  *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006).

"Next, the court must 'determine whether a sentence within that range serves the factors set forth

in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'"

*Id.* (*quoting United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).  Thus,

> a sentencing court must consider "the nature and circumstances of
> the offense and the history and characteristics of the defendant" and
> the need "to reflect the seriousness of the offense," provide "just
> punishment," "afford adequate deterrence," "protect the public,"
> and "avoid unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (*quoting* 18 U.S.C. § 3553(a)); *see*

*also United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011) (following *Moreland*).

### A.      Nature and Circumstances of the Offense

To describe the defendant and Mr. Faulkner's crimes as "sexual abuse" serves only to

sanitize and dismiss the horrific, repeated raping of a three- and, later, four-year-old child.  The

defendant and Mr. Faulkner engaged in particularly offensive efforts to first "groom" the child to

make her more comfortable.  During their October 2016 trip, for example, they took the child out

for pizza and ice cream, as well as bought her toys.  PSR ¶¶ 12, 20.

The PSR describes in detail the specific sexual activities the defendant and Mr. Faulkner

undertook with this small girl, PSR ¶¶ 13, 15, 17, often with the physical assistance of Mr. Hix

to restrain her, PSR ¶ 17.  The defendant and Mr. Faulkner filmed their cruelty and published it

3

for other pedophiles to watch, PSR ¶ 18.  Countless other copies of these images likely still exist in the underground pedophilia networks.

**B.    History and Characteristics of the Defendant**

The defendant, age 27, has no criminal history.  He was raised in a stable home with married parents and, in fact, resided with them at the time of this offense. PSR ¶¶ 53-58.  The defendant has been employed in the information technology field.  PSR ¶¶ 68-71.

The defendant's interest in child pornography and abuse, however, likely predates the instant offense.  His electronic devices contained over 16,000 images of child pornography.  PSR ¶ 21.  Furthermore, the defendant's candid communications with another pedophile reflect an extreme prurient interest in children, especially babies and toddlers.  PSR ¶ 43.  Selected highlights of the extensive messages intercepted by law enforcement—most of which have no place in a public filing—are excerpted in the PSR.   For example, the defendant expressed an interest in "spotting kids" or finding a child "to adopt or foster." *Id.*

**C.    A Sentence of 50 Years' Imprisonment Serves the Factors of § 3553**

1. Seriousness of the Offense; Promote Respect for the Law; Provide Just Punishment

The defendant's crime is among the most serious in the United States Code.  He and Mr. Faulkner irreparably harmed the youngest and most vulnerable in our population and a sentence of 50 years is appropriate.  Both the child's mother and grandmother have provided victim impact statements that help explain the seriousness of the offense.  The four-year-old victim "is now timid and afraid around other men.  [The child] now needs a relaxation tape at night to help her fall asleep.  She is scared of the dark and wakes multiple times with nightmares because of her memories of [the defendants] and the abuse she suffered.   She wakes up screaming."

4

Mother VIS ¶ 2.  Her grandmother notes that the child "almost certainly have issues with men. She will almost certainly have trust issues."  Grandmother VIS ¶ 6.  These crimes also have affected the victim's family.  The child's mother no longer attends college so that she can help the victim "develop a routine."  Mother VIS ¶ 4.  Her grandmother prudently notes, "We live each day trying to help [the child] process and understand what has happened to her.  It is going to take a lifetime."  Grandmother VIS & 7.

A sentence of 50 years' imprisonment also sends a clear message to individuals who produce, purchase, and collect child pornography. Such individuals, like the defendant, promote their personal desire for perverse sexual gratification above children's right to safety, happiness, and self-respect. A lengthy prison sentence presents a substantial, permanent impediment to their ability to gratify their criminal desires. A sentence of 50 years' imprisonment will help to send that message, and may deter others sharing the defendant's interests from following in his footsteps.

2.  <u>Need to Deter Future Criminal Conduct and Protect the Public</u>

A sentence of 50 years' imprisonment will ensure that the defendant is incarcerated until he is approximately 69 years old.  After that time, he will be a registered sex offender and under the supervision of a federal probation officer.  His advanced age, in combination with these legal obligations, should be sufficient to deter him from future criminal conduct and protect the public from the defendant.

5

3. <u>Need to Avoid Unwarranted Disparities</u>

The defendant's present activities do not fall outside the heartland of criminal offenses, and a sentence of 50 years will ensure that no unwarranted disparity exists between his sentence and the sentence of a like-positioned defendant.

### III. Conclusion

The defendant's abusive, exploitative actions are those of a truly depraved individual. Our society places a great and justified importance on the safety of our children, and the defendant's actions demonstrate, beyond any doubt, that he is a threat to children. The Court therefore must seek to impose a sentence that will prevent him from abusing children and from accessing the tools used to exploit children. Accordingly, for the reasons stated above in light of the factors contained in § 3553(a), and in the supplemental information submitted to this Court under seal, a sentence of 50 years' (600 months) imprisonment is sufficient, but not greater than necessary, to achieve the factors set forth in 18 U.S.C. §3553(a).

**J.A. 69**

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

_____/s/_____
Jessica D. Aber
Assistant United States Attorney

Lauren Britsch
Special Assistant United States Attorney

Elham Peirson
Trial Attorney
United States Department of Justice,
Child Exploitation and Obscenity Section

United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: jessica.d.aber@usdoj.gov

7

**J.A. 70**

CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2017, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

all counsel of record.

<div style="text-align:center">_____/s/_____</div>

Jessica D. Aber
Virginia Bar No. 72680
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: jessica.d.aber@usdoj.gov

**J.A. 71**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:17cr49 |
| | ) | Hon. John A. Gibney |
| PATRICK FALTE, | ) | Sentencing: September 15, 2017 |
| Defendant. | ) | |

## DEFENDANT'S AMENDED POSITION ON SENTENCING AND REQUEST FOR A NON-GUIDELINE SENTENCE

COMES NOW the defendant, Patrick Dane Falte, by counsel, Carolyn V. Grady, and files this Amended Position on Sentencing and request for a non-guideline sentence pursuant to Rule 32 of the Federal Rules of Criminal Procedure and Section 6A1.3 of the advisory United States Sentencing Guidelines ("USSG" or "Guidelines").

The only amendment to the Position is to page 14 where a mathematical error was corrected in the first paragraph of Section 6. The number 63 was changed to 53 and the rest of the Position remains unedited but for that correction.

Mr. Falte has received and reviewed the Presentence Report ("PSR") and notes no corrections or objections to the Presentence Report, which guidelines suggest the imposition of a life sentence and a special assessment of $100. PSR ¶ 75. The special assessment of $5,000 per 18 U.S.C. § 3014 is not appropriate, as Mr. Falte is clearly indigent. PSR ¶¶ 5, 79. The fine of at least $50,000 is not also appropriate due to his financial condition. PSR ¶ 82.

After consideration of all of the evidence, this sentencing position and the filings from the United States, and the sentencing factors of 18 U.S.C. § 3553(a), Mr. Falte requests that the Court impose a sentence of 30 years (360 months) as this sentence is sufficient and not greater than necessary to achieve the goals and objectives of the sentencing statute.

In support, Mr. Falte submits the following:

**J.A. 72**

**Case History**

On October 3, 2016, Mr. Falte and his co-defendant were arrested in Prince William

County on a Criminal Complaint Pending in Tennessee. ECF No. 1. The United States Attorney

for the Eastern District of Virginia also filed a Criminal Complaint. ECF No. 4. On October 4,

2016, Mr. Falte appeared before a United States Magistrate Judge for his initial appearance on

the Criminal Complaint at which time he was detained. ECF Nos. 3, 6. On that same date, the

United States dismissed the pending complaint in Tennessee. On October 6, 2016, Mr. Falte

waived his preliminary and detention hearings, thereby agreeing that there was probable cause

for the crimes as charged and he did not argue for release. ECF Nos. 16, 18. Mr. Falte has

remained detained since his arrest on October 3, 2016.

On May 4, 2017, the United States filed a one count Criminal Information charging him

with Aggravated Sexual Abuse of a Minor, in violation of 18 U.S.C. § 2241(c). PSR ¶ 1. This

crime carries a mandatory minimum sentence of 30 years imprisonment. On May 10, 2017, Mr.

Falte accepted responsibility for his actions, waived his right to indictment by grand jury and

pled guilty to the Criminal Information. PSR ¶ 2; ECF No. 47. By waiving all of these rights, Mr.

Falte saved the United States the expense and effort of putting on evidence before a grand jury:

he also saved the members of the grand jury from seeing the images and hearing of the nature of

his crime.

As part of the plea agreement, the United States and Mr. Falte agreed to a sentencing

range: the United States agreed to recommend a sentence of no greater than 50 years and Mr.

Falte reserved the right to argue for the mandatory minimum. PSR ¶ 3. Both the government and

Mr. Falte strongly urge the court to sentence him within the range of 30 to 50 years. PSR ¶ 84.

In summary, Mr. Falte requests that he be sentenced to the mandatory minimum 30-year

sentence followed by a lengthy period of supervised release. This sentence is a substantial term –

**J.A. 73**

greater than the number of years he has been alive – and is sufficient but not greater than

necessary to accomplish the goals of the sentencing statutes. This is a long sentence for his first

arrest for any criminal conduct and will incarcerate him until he is almost 60 years old.

The sentencing is scheduled for September 15, 2017.  PSR ¶ 2.

## Legal Framework

While this Court must still correctly calculate the guideline range, *Gall v. United States*,

552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson*

*v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be

considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a).  *Kimbrough v.*

*United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors,"

"make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how

the facts relate to the purposes of sentencing.  *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct.

1229, 1242-43 (2011).  The Court's "overarching" duty is to "'impose a sentence sufficient, but

not greater than necessary' to accomplish the goals of sentencing."  *Id.* at 101; *Pepper*, 131 S. Ct.

at 1242-43. After listening to the parties' arguments as to the appropriate sentence, a sentencing

judge must look to the other sentencing factors delineated under 18 U.S.C. § 3553(a) to

determine whether they support the sentence requested by the parties. *See Gall*, 552 U.S. at 49.

The other factors courts must consider when imposing the appropriate sentence are the nature

and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. §

3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for

the law, provide just punishment, afford adequate deterrence, protect the public, and provide the

defendant with appropriate correctional treatment, *id.* at §3553(a)(2); the kinds of sentences

available, *id.* at §3553(a)(3); the need to avoid unwarranted disparity among defendants with

similar records and conduct, *id.* at §3553(a)(6); and the need to provide restitution to any victims

**J.A. 74**

of the offense, *id.* at §3553(a)(7). The overarching admonition of 18 U.S.C. §3553(a) is that

courts are obliged to "impose a sentence sufficient, but not greater than necessary to comply with

the purposes set forth in paragraph (2) of this subsection."

<u>**Argument under 18 U.S.C. § 3553(a)**</u>

**1.   Given the Nature and Circumstances of Mr. Falte's Offense and His History and Characteristics, the Sentence Requested Is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act ("SRA"), Congress did "not favor [] one purpose

of sentencing over another," except that rehabilitation was not to be a reason to impose a

sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983).  Rather, "each of the four stated

purposes should be considered in imposing sentence in a particular case," and "one purpose of

sentencing may have more bearing on the imposition of sentence in a particular case than another

purpose has."  *Id*. at 68.  In choosing what kind of sentence to impose, the court must consider all

of the purposes and factors set forth in § 3553(a) and impose a sentence that is sufficient but not

greater than necessary to satisfy the purposes of sentencing.

**2.    Nature and Circumstances of Patrick Falte's Offense**

It is clear from the evidence that Patrick "Dane" Falte committed a crime for which there

is no excuse and little way to mitigate.  This sentence will not reduce the victim's injuries nor

will it take away her pain. The only issue left is what the appropriate punishment for Mr. Falte's

actions and whether the court should impose the mandatory minimum or a sentence ten or twenty

years beyond that extremely long sentence. This sentencing is about what is sufficient but not

greater than necessary and a 30-year sentence will serve the interests of justice.

One mitigating factor that the court should consider regarding the offense is that on the

same day of his arrest, within hours, Dane confessed to his crimes and did what he could to

mitigate his harm to others. Following his arrest, Dane agreed to remain incarcerated while the

United States and his counsel consulted and determined the charge or charges to which he would plead.[1] Accordingly, when the United States filed the Criminal Information, Dane pled guilty, thereby saving the victim and her family from testimony and the United States from the time and expense of trial.

In terms of punishing the most culpable parties involved in this case, it is important to note that Mr. Hix, the codefendant who has not yet been prosecuted by the United States, allowed his daughter to be repeatedly abused. ECF No. 53, ft 2. The other codefendant, Mr. Faulker, has another "touch offense" charge currently pending in Texas. This charge is Mr. Falte's only "touch offense." Justice dictates that Mr. Falte receive a lesser sentence when comparing his actions to the actions of the other offenders in this case. PSR ¶ 8.

### 3. Mr. Falte's History and Characteristics

Dane is a 27 year old young man who has been tortured by his thoughts since he was a young child. Dane comes from a good family as evidenced by Attachments A to C. PSR ¶¶ 62-63. He has never been married, has no children and has lived with his parents for his entire life. PSR ¶¶ 62-64. In fact, Dane has never really had a girlfriend or close companion. After persevering through school with a learning disability, childhood depression issues and a serious medical condition, Dane graduated from high school and attended ITT Tech where he obtained a technology degree that helped him attain a good well-paying job. PSR ¶ 75. The PSR indicates that Dane has a strong employment record in Network Security where he earned $69,000 last year. PSR ¶¶ 76-79. Dane has never been arrested - not as a juvenile or an adult - he was issued one ticket for a traffic infraction. PSR ¶¶ 53-59. Even though he appears to have been

---

[1] Not that release was likely or even possible but Mr. Falte did not waste anyone's time pursuing that option.

**J.A. 76**

reasonably successful in life, he clearly was a troubled young man, evidenced by his wish to die when only an eight-year-old child.

In the past few months, Dane was examined by Dr. Boyd of the University of Virginia Forensic Clinic of the Institute of Law, Psychiatry and Public Policy. Dr. Boyd evaluated and tested Dane and produced a 19 page Psychological Evaluation, hereinafter referred to as "the Evaluation." [2] Dr. Boyd diagnosed him with Major Depressive Disorder and Pedophilic Disorder. Evaluation, pp. 10-11.

The major depressive disorder diagnosis is no surprise to his family as it appears clear from the Evaluation, the PSR and the supportive letters that he has been clinically depressed his entire life. Dane had such a deep depression that he wanted to die when he was just a child. How bad could his life have been at approximately age 6 to 8 to tell his mother that he would be better off dead? Evaluation, p. 5. Adding to his complicated and painful background, as a young teenager, Dane was violently victimized by an adult male but never felt able to speak about it until recently. [3] He was never able to process the pain, the shame, the anger, or the emotions associated with that violent act and how it harmed his psyche.

Dane first tried to kill himself when he was 19, probably related to his growing concern that "I aged but my attraction may not have." Evaluation p. 5. The Vanderbilt Hospital records indicate that he was "guarded" and spoke in vague terms about feelings of intense guilt and the urge to punish himself. *Id.* Sadly, he did not accept any treatment for his mental and emotional

---

[2] This Evaluation should help the court better understand the background and mental disorder that Dane suffers from as well as outlines the risk factors and other factors that should be considered by the court before sentencing. A copy of this Evaluation is not attached to this Position on Sentencing due to the private nature of the information therein. A copy will been provided to chambers, United States Probation and the United States Attorney.
[3] It is important to note that Mr. Falte does not blame his condition on this sexual assault. As the Evaluation describes, it appears that it influenced his thought process but did not create the attraction. Evaluation, pp. 8-9.

pain as he told Dr. Boyd that he was aware of the stigma attached to his pedophilic interests and he was fearful of the consequences. *Id.* As a younger teenager, he also engaged in "cutting" himself which releases internal pain while at the same time inflicting physical pain.  PSR ¶ 73. Dane also tried to kill himself in the Northern Neck Regional Jail this fall, motivated again by self-loathing and fear. Evaluation, p. 5; PSR ¶ 72.

As the Evaluation reveals, Dane was a young adult whose life has been dominated by self-loathing over what was going on inside his head. He hated himself for not outgrowing his attraction to children and could find no way to deal with this intense self-loathing. Evaluation, p. 5.  He has had suicidal ideations on and off for many years. Evaluation, p. 6. As noted before, he tried to kill himself about 7 years before his conduct in this case. Dane also tried to numb his unwanted feelings through alcohol abuse or abuse of the pain medications he was prescribed as a child for his serious medical issues. PSR ¶ 74. This self-hatred coupled with major depression permeated his life and are factors that the court should consider as primary factors in his background and his characteristics.

The Evaluation contains several important conclusions that the Court should recognize before imposing sentence. First, Dr. Boyd noted that Mr. Falte's lack of defensiveness about his cognitive distortions "may bode well for his amenability to treatment." Evaluation, p. 8. Second, his willingness to engage in sex offender treatment and the PAI results "suggest that he is amendable to psychological treatment." Evaluation, p. 10. Third, Dane is not anti-social, or psychopathy, but rather is on the autism spectrum disorder and someone that has suffered Major Depressive Disorder his entire life. Evaluation, pp. 10, 14. In essence, the testing results do not indicate a high risk of reoffending and that he is amenable to sex offender treatment to further reduce his risk upon his release. Evaluation, p. 16.  Lastly, Dr. Boyd made an observation that the court should note at the time of allocution – "Superficially he appears to be flat, emotionally,

and has a deadpan communication style, however his history, testing, and verbal statements indicate that he has strong emotional reactions that are not outwardly conveyed. Thus, he may appear unconcerned or emotionally neutral when he is in fact distressed."  Evaluation, p. 17.

    An insightful article published in Psychology Today in December 2015, entitled "Sympathy for the Deviant" ("Sympathy Article") outlines the life and difficulties of someone who had an attraction to younger boys and who acted on his thoughts.  See Attachment F. The Sympathy Article illustrates some of the difficulties and pitfalls of someone who has the unwanted attraction to children. This Article provides examples of the "intense stigma surrounding child sexual abuse clouds an already misunderstood subject and may even prevent people from getting help before they commit harm."  The relevance of the Sympathy Article is that the secret attraction of the subject of the article is the same attraction that Dane suffers from and the article outlines the struggles which "leaves no opportunity for intervention, let alone empathy for whatever internal struggle they be engaged in to control themselves."  Sympathy Article, p. 85. The author notes that people with attractions to children have no "reality check" to bounce up against due to their isolation. Their shame and isolation feeds the risk of acting out as they have no one to share their feelings with or get feedback about their thoughts or actions. These offenders have no one to go to for help – and society never offers them hope of a cure such as is evident with drug addicts, those with gambling issues or eating disorders or have HIV. Society offers help, treatment or community support for those folks. However, "[p]eople attracted to juveniles also internalize the message that they can't be cured" as they are not offered any hope or guidance in society. Thankfully, Dane has received some helpful information through the evaluation process. He now knows that he can get the help he so desperately needs and Dane looks forward to trying to heal himself and find a way to never offend again.

Dane's family have expressed their love for Dane in spite of his actions and will continue to support him throughout this difficult time in his life. See Attachments A to C. They all wrote that he is a generous person who gave of himself to his family, friends and neighbors.  To them, Dane appeared to be a happy, funny, loving person – no one knew about the thoughts and actions that surfaced on and before October 3, 2016.  Dane was so good at separating himself from his family that they were never able to see his thoughts, his torment or his pain.

His mother Patricia Falte wrote an insightful letter about how her son struggled all of his life with a secret he could not reveal to anyone. See Attachment A. She never understood why he was secretive about his feelings – she now knows why and still loves him, faults and all. PSR ¶ 66. Patricia noted how his medical condition and chronic abdominal pain separated him from his peers. She also noted that his learning disabilities set him apart as well. She now looks back at her son's childhood pictures and sees his pain and depression in his eyes, even though his smiled. Since his arrest, his mother has learned more about her son than any mother wants to know – she learned why Dane was a loner. PSR ¶ 66. She learned of his pain, his actions and now his shame. She wrote that Dane has expressed remorse and feels ashamed and embarrassed and not worthy of her love. She will pray for him every day that he gets the help that he so desperately needs.

His father Pete Falte wrote how he was blindsided with these charges as he had never seen this side of his son – Dane was always kind, generous son that was always helping his friends, neighbors and teachers with their computer problems.  See Attachment B. He shared that his son had dreams of college and "eventually joining the military or the FBI to work in network security and to fight computer hacking."  He was just that smart. His father outlined the efforts that Dane took to overcome his medical disabilities and make it to a successful job. He believes that Dane can use this same kind of effort to overcome his mental disorder. Dane has told his father that he feels sorry for his crimes and causing harm to others. Dane told his parents that he

**J.A. 80**

wants help dealing with the thoughts that led to his actions. His dad knows that there is a part of his son that needs help and will be punished for his crimes but he remains supportive and loves his son: Pete Falte is asking for a chance for his son for some type of future outside of prison.

His sister Christa wrote about how Dane struggled all of his life in one way or another. See Attachment C. She has always known him to be a comfort to her during their childhood struggles and he was the ideal older brother who always protected her. Christa noted that he always seemed to suffer from depression but that he persevered through those low times. She called Dane resilient and believes he will overcome this huge obstacle as he has overcome other significant issues in his life. She trusts that he will get the help that he needs so that he can be the person she knows him to be: a generous, considerate and kind person. She wrote that despite his grave mistakes, she believes "him to be the wonderful and caring person he has always proven himself to be."

Another important aspect of Dane's characteristics to consider is that it is clear that Dane suffers from the mental disorder of Pedophilic Disorder. See Evaluation, p. 11. This is a lifelong disorder but he can be refocused so as to not act on his thoughts and attractions – something that he has never done in the past. As noted in the DSM 5, "[p]edophilia per se appears to be a lifelong condition" but the course of pedophilic disorder (acting on the attraction) may fluctuate, increase or decrease with age. See DSM 5, page 699. As Dane told Dr. Boyd, he knew that these feelings that were not normal but had no ability to receive counseling or help to control his attraction. Dane was caught in a world no one wishes to be contained by – that he had this attraction but could not seek counseling or assistance due to the stigma attached to this disorder as well as the mandatory reporting requirements for any counseling he could have received.

The Evaluation and PSR outline the isolation that Dane has always felt since childhood. He was isolated from his peers, either through his constant medical condition or by self-

selection. His Crohn's disease caused him physical pain from a young age and constant difficulties and surgeries complicated his high school years. PSR ¶¶ 67-68. His thoughts and feelings also forced him to separate himself and go to the "dark web" to talk about his issues and find some sort of comradery among like-minded people. PSR ¶ 73. In 2015, Dane was part of an on-line community-based support group to help others in his position to talk about their issues. Dane told the agents that he had wanted to "quit" the website, and some computer evidence bears out this desire. Sadly, he did not do so before he offended against the victim in this case.

Dane told the probation officer that he is deeply remorseful for his actions. Dane told his family that he is sorry for what he did and remains concerned about how this conviction will affect their lives. PSR ¶¶ 35, 66.  He will tell the court that he remains remorseful and will live the rest of his life trying to be good to others so that he can try to make up for the damage he created.

### 4.  Need for Just Punishment in Light of the Seriousness of the Offense

Section 3553(a)(2)(A) requires a sentencing court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. This is obviously a serious offense – but so is a thirty-year sentence for a 27-year-old young man. Since Dane had never been arrested prior, and will serve a sentence into his 60s, this will promote his respect for the law. This 30-year sentence also provides just punishment as it is practically a life sentence but gives him some hope of reuniting with his family upon his release.

Further, this sentence will be particularly difficult for Mr. Falte because Dr. Boyd believes that, due to Mr. Falte's PAI results and history, there are indications that he would be unusually vulnerable to exploitation and abuse in the prison environment; even aside from the targeting that will occur based on the nature of his conviction. This vulnerability is compounded, Dr. Boyd noted, when his prior sexual history is taken into account. Evaluation, p. 17. In short,

every day of his sentence will be dominated by his fear from physical attack: 30 years of that

would be enough for anyone, much less Mr. Falte with his more fragile medical condition.

        Also, Mr. Falte will suffer physically more than the average inmate given his complex

medical condition and the inadequate medical care within the Bureau of Prisons. A 2015 audit by

the Department of Justice's Office of the Inspector General reviewed the Bureau of Prisons'

handling of its aging inmate population ("2015 Audit").[4] The 2015 Audit reveals that in the

seven years since the BOP's inmate healthcare was last investigated in 2008, little has changed.

*See* 2015 Audit, page 21. There is little reason to believe things have improved since the 2015

Audit if nothing changed on those eight years between the audits. The BOP has continued

struggling to provide adequate healthcare and safe accommodations, particularly to its aging

inmates. The 2015 Audit found that inadequate staffing in Health Services Units as well as

throughout BOP institutions leads to delays for care. A Case Worker at a non-medical BOP

institution reported to the auditors that the institution was "over a thousand inmates behind" in

treating those enrolled in chronic care clinics. *Id.* at 17. This lack of healthcare workers inside

BOP institutions leads to a greater need for outside medical visits. *Id.* at 18. These visits are

limited as well by the availability of Correctional Officers, resulting in further waitlists for

medical care. *Id.* At one institution, the Associate Warden told the auditors that his staff can only

accommodate six trips to outside medical specialists per day, even though the inmate population

requires eight to 10 trips per day. *Id.* BOP data from another institution found that the average

wait time for inmates needing to see outside specialists like cardiologists and pulmonologists for

follow-up and routine appointments was 256 days or almost 10 months. *Id.*  If anything goes

awry with treating Mr. Falte's Crohn's disease, such as a delay in medical treatments, it very

---

[4] This audit can be found at https://oig.justice.gov/reports/2015/e1505.pdf. It was not attached to
this Position, as it is 72 pages long.

well could be fatal. See Doctor's Letter, Attachment E. In summary, all of the inadequacies within the BOP's medical facilities will constitute a greater punishment and should be considered by this Court.

### 5.  Need for Adequate Deterrence

Section 3553(a)(2)(B) requires a sentencing court to impose a sentence that affords adequate deterrence to criminal conduct.  There is no more deterrence to an individual than to receive a sentence greater than the number of years he has been alive.  For someone who has never spent a day in jail prior to October 3, 2016, a thirty-year sentence will be sufficient. Certainly, an additional 20 years would incarcerate him longer but would provide no additional deterrence than the first 30 years.  With the programing he will receive in the Sex Offender Program within the BOP, he will learn from his past and minimize any chance of any offending conduct upon his release.

The empirical evidence is unanimous that there is no relationship between sentence length and general deterrence, regardless of the type of crime.  *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

### 6.  Need to Protect Society

Section 3553(a)(2)(C) requires a sentencing court to impose a sentence that protects the public from other crimes of the defendant. With a thirty-year sentence, Mr. Falte could be released in 26 years if he earns all of the good time credits- he would be 53 years old and well past the age of offending given the restrictions that will be placed upon him upon his release. If given a fifty-year sentence, he could be released in 43 years with good time credits and he would be 70 years old upon his release. No one in society would be in danger from him at either age and thus the thirty-year sentence is sufficient and not greater than necessary.

According to the United States Sentencing Commission ("USSC"), recidivism rates in general (including technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50 and down to 9.5% for offenders over 50.  USSC, *Measuring Recidivism*: *The Criminal History Computation of the Federal Sentencing Guidelines*, (2004), at 12 and Ex. 9.

Further, the Evaluation reports that Mr. Falte is at a Moderate to Low risk of reoffending given his risk scores and that a longer sentence does not mean he will be less of a risk upon his release. Evaluation, p. 13-4. In short, Mr. Falte is a low risk offender, even with the nature of his crime, this court does not need to incarcerate him longer to protect society. See Evaluation, pp. 17-18.

### 7.  The Kinds of Sentences Available and the Guidelines

Section 3553(a)(3) requires the court to consider the kinds of sentences available. The conviction to which Mr. Falte pled carries a maximum of 30 years to life in prison. PSR ¶¶ 37 to 49. The court is not required to sentence Mr. Falte to life imprisonment - but rather must begin consideration of the appropriate sentence at the 30-year mark.

Section 3553(a)(4) requires the court to consider the guidelines and the range established by the guidelines. The guidelines suggest a life sentence but both the United States and Mr. Falte agree that a sentence from thirty to fifty years is appropriate. In spite of the crime committed, the United States still recommends a sentence within that range.  As stated throughout the Position, a 30 year sentence is sufficient and not greater than necessary to accomplish the goals of 18 U.S.C. §3553(a).

**8.   The Sentencing Commission's Report to Congress on Life Sentences**

As the Court is aware, the United States Sentencing Commission issues reports on a variety of issues.  One such report is the Report on Life Sentences published in February 2015 ("the Report").[5] This Report analyzes which kinds of offenders have received a life sentence, for what crimes and the total number imposed in the United States. Specifically, the Commission noted that the life sentence is only mandated in four of the 150 crimes outlined in the USSC Guidelines Manual. That is to say, the USSC recognizes that there are only four types of crimes that automatically mandate a life sentence:  sexual abuse is not among those four.  Report, p. 3. The Report also details the number of life sentences imposed in fiscal year 2013 – 153 cases – and 68% of those sentences were imposed after a trial. Report, p. 9. As the court is aware, Mr. Falte pled guilty and saved the resources that would have been spent preparing for trial. As of January 2015, there were 4,436 prisoners incarcerated for life sentences - accounting for 2.5% of all federal offenders. Report, p. 4. Thus, statistically, a life sentence is rarely imposed, and usually imposed on a defendant who went to trial. Further, the United States is not asking for a life sentence but rather a sentence of 50 years which the United States believes will cover the rest of Mr. Falte's natural life.

---

[5] This Report is 29 pages long can be found at https://www.ussc.gov/research/topical-index-publications#life.

Most importantly, the Report analyzed 'de facto' life sentences and concluded for the purposes of analysis, a sentence of 39.1 years (470 months) is the equivalent of a life sentence.[6] Report, p. 10. These 'de facto' life sentences have been imposed in sex abuse cases, and only account for just 1.4 % of all sex abuse sentences. Report, p. 11.  The recommendations of Mr. Falte and the United States are 10 years over and under from this 'de facto' life sentence.  This court should feel comfortable with the harshness of a 40 year sentence as that is just above a 'de facto' life sentence as calculated by the USSC.

### 9.    The Need to Provide Medical, Educational and Vocational Assistance

This Court must consider the medical, vocational and educational needs of the defendant before issuing the sentence and the court cannot lengthen any sentence to provide such treatment or training.

In this case, Mr. Falte has significant medical issues that must be attended to by the highest level BOP medical facility. PSR ¶¶ 67-68. Any mistreatment or delay in treatment could lead to his death. See Attachment E. As this Court should be aware from the 2015 Audit, the BOP is sorely lacking in the number of capable physicians and consistent medical care, and is replete with delayed treatment of serious but not acute medical conditions. Mr. Falte's conditions are acute if he is not given his medically prescribed treatments. Therefore, Mr. Falte requests that the Court recommend that he be designated to a facility that provides the highest level of medical care.

Finally, Mr. Falte requests that the Court place in the Judgment and Commitment Order that he be designated to a facility close to his family who are relocating to Florida.  Anyone in Dane's situation needs to have the family support to survive this very lengthy sentence.

---

[6] The USSC used a statistical analysis to determine the life expectancy of a federal inmate and calculated it to be 66 years. Report, pp. 16-17.

**J.A. 87**

**Conclusion**

Mr. Falte recognizes that his offense conduct is very serious and has affected a real

victim.  He has done what he can to make amends for his conduct and he will spend at least the

next 30 years working to assure that this does not happen again. For his conduct, he will be

punished for the rest of his life.  Mr. Falte is asking that the Court give him some hope for his

future – and temper justice with mercy by imposing a sentence of thirty years followed by a

lengthy period of supervised release.

<div align="right">

Respectfully submitted,

PATRICK DANE FALTE

</div>

By:    _____/s/_____
Carolyn V. Grady, Esq.
Assistant Federal Public Defender
VA Bar No. 30445
Counsel for Mr. Falte
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0855
Fax (804) 648-5033
carolyn_grady@fd.org

**J.A. 88**

**CERTIFICATE OF SERVICE**

     I hereby certify that on September 8, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record: Jessica Aber, Assistant United States Attorney, and Lauren Britsch and Elham Peirson at the Department of Justice.

                                    /s/
                            Carolyn V. Grady, Esq.
                            Assistant Federal Public Defender
                            VA Bar No. 30445
                            Counsel for Mr. Falte
                            Office of the Federal Public Defender
                            701 E. Broad Street, Suite 3600
                            Richmond, VA 23219-1884
                            Ph. (804) 565-0855
                            Fax (804) 648-5033
                            carolyn_grady@fd.org

USCA4 Appeal: 17-4630    Doc: 21    Filed: 02/12/2018    Pg: 94 of 146

To: The Honorable John A. Gibney
C/o Carolyn v Grady, Assistant Federal Public Defender
08/28/2017

Your Honor,

I am Patricia (Pat) Falte, Dane's (Patrick's) mother. I have worked in healthcare for 25 years and human resources for an additional 11. With the exception of about a year, Dane has lived with us as a part of our family at home. I have had the honor of watching him grow into a very kind, thoughtful and caring young man and I am very proud to call him my son. Dane and I are close and I love him unconditionally. Recently, I learned my son's secret. He loves a child as a man loves a woman or a homosexual loves the same sex. He knows he should not have these feelings, but cannot change how he feels. I love my son. Since I have learned this secret, my love for him has not changed. Now, many things about him make more sense.

Growing up, Dane was a happy kid. He was popular with his teachers at school, which irritated his sister. She was three years behind him and those same teachers would talk about how wonderful and funny Dane was. Though popular with teachers and people he worked with, surprisingly he had only two actual friends that we knew of. Dane never opened up about his feelings to friends or family and until recently, we never understood why.

Early on his life, he struggled in school and with intermittent abdominal pain. Over time became a loner. In elementary school, Dane struggled with his ability to read and comprehend. He eventually overcame his learning struggles following his enrollment at Sylvan Learning Center. After relearning phonics (he was in 9th grade by then), he went from a failing to an A-B student. In college, he was on the honor role for multiple quarters. His teachers and other students would often reach out to him for help. Dane was very proud of this.

Dane also struggled with chronic abdominal pain and was very thin most of life. He grew tall very quickly and thus experienced a lot of pain both in his long bones and abdomen. His pediatrician thought it was simply growing pains. He was 18 when we learned the cause of his pain was bowel inflammation from Crohn's Disease. His excellent work history began to suffer as the disease progressed and his treatments became more aggressive. After his bowel resection and finally having his Crohn's under control, he gained weight and put on muscle mass.

While his confidence seemed to improve, he remained a loner and had trouble finding work. He still confided in no one. After his incarceration, we learned he had been struggling with depression although we did not see it. Looking now at what few recent photos I have of him, I can see the pain in his eyes even though, in the picture he is smiling.

My Dane is a sweet, loving boy that always wanted to help others. He never got into trouble and I never worried about what he was doing. He was usually home. He often helped with the dishes, carried my 40 lb. cat litters upstairs, and often surprised the family with supper. He brought me chocolate covered raisins (my favorite), ran to the store for soda and crackers when his sister was sick and mowed the lawn to help his dad. He assisted neighbors and co-workers with computer issues and felt "funny" accepting money when they offered. He even volunteered to drive with me to Sarasota to deliver an electric recliner to his nana's house for Christmas one year. One of my favorite memories is he used to come by my work and have lunch with me once a week since he worked in the area – an event I always looked forward to. I loved spending time with Dane. Everyone we came across that knew Dane, asked about him and spoke of him fondly. People really liked him.

This is the Dane I knew and have always known. Since October of 2016, I understand him even better. He was a loner because no one wants to hear about someone having thoughts about children. They would distance themselves. He has expressed remorse. He feels ashamed and embarrassed. He feels not worthy of anyone's love. I love my son. I look forward to having my son come home. I pray he gets the help he needs in prison. There, I understand, he will have access to programs designed for people that think and feel as he does. I hope that same type of help will be available to him (and to all of us) when he comes home. He is a wonderful young man and I miss him so very, very much.

Thank you for your time.

Pat

Patricia Falte, Patrick "Dane's" mother

Attachment A

To: The Honorable John A. Gibney
C/o Carolyn v Grady, Assistant Federal Public Defender

Your Honor,

My name is Charles Falte, I am a Project Manager, and Patrick Dane Falte is my son. The hardest thing for me, outside of knowing my son committed these acts and will spend most or all of his life in prison, is understanding how my son, who was well liked, never in trouble, and always willing to help others did these things. I was blindsided by this and I have been in total shock since it happened. I never saw the side of Dane that did this, only the kind, generous son that was always helping friends, neighbors, teachers, and family with their computer and IT problems, and helping at the Second Harvest Food bank. The son that brought home dinner and lunch for the family on occasion.

I have spoken with my son many times since his arrest. He talks about feeling sorry for committing the crimes and causing harm to other people, and his desire to get help in dealing with the thoughts that led to this.  When Dane was young, he struggled in school due to hearing issues, which affected his grades and self-esteem. Once the hearing issues were resolved, we sent him to a learning center to get tutoring and help with his grades. Dane had a desire to improve himself, and had dreams of making it into college and eventually joining the military or FBI to work on network security and to fight computer hacking. He committed himself to working hard, improving his grades up and he succeded in making it into college. Dane has the desire to get help with the impulses that led to this crime and I believe that with support he will show the same willingness and will do it.  I will never understand why my son did these things, and can never approve of his actions, but I will always love my son and will continue support him in any way I can.

Dane's work history may come into question, so I wanted to explain why he took breaks between jobs. He suffers from an advanced case of Crohn's disease, which sidelined him on multiple occasions due to pain from the Crohn's disease and from the treatments that he received. It also eliminated any chance of achieving his dream of serving in the Navy, which he applied for due to his Crohn's disease, and it made his FBI dream very difficult due to his work history. I served alongside many brave and courageous people when I was in the Marines, but after watching him give himself an injection in the thigh and stomach each month, having part of his colon removed, and facing chemo treatment every two months after the surgery I could see that courage comes in many forms and at any age. He worked hard and pushed through that adversity as well, managing land a good job with a good future, until the arrest. I believe that Dane will show the same dedication and will  go on to lead a good life as a law-abiding citizen if given the support and opportunity.

There is a part of Dane that needs help and will be punished for the crimes he committed. But there is also a part of Dane that is kind, generous and loving to everyone, and that person is worthy of another chance. I will always I support him and love him.

Sincerely,

Charles "Pete" Falte

I am Christa Falte, I currently work as the lead toddler teacher at a local preschool and am working towards a degree in early childhood education. Dane is my older brother and has lived at home with my family and me for the vast majority of my life. I have not spoken to my brother much since October 2016 however, the unconditional love and support I have for him has not waned. Despite his grave mistakes I still believe him to be the wonderful and caring person he has always proven himself to be.

I have always known Dane to be a generous, considerate, and kind person. Throughout the years he has remained the most consistent figure in my life. Through every high and low in my life Dane has been a great comfort. We have both faced our fair share of struggles and have both had trouble communicating them. However, my brother has always found ways to show kindness towards me and others. He has always been willing to sacrifice his time to instead help others with whatever it is they may need. As children Dane would push me on the swings at the park on our way home from school, played with me when I did not have anyone, and never hesitated to check all around my room and closet after a nightmare. As we grew older he showed me the same thoughtfulness by buying me lunch, watching my favorite movies with me despite his personal feelings on them, and frequently going out of his way to run errands for me without asking for anything in return. Dane has always proven himself to be a selfless person.

Throughout my school years I encountered many teachers who had my older brother as a student in previous years. I heard nothing but positive words and large amounts of praise from every person who encountered him. The words often used to describe him were kind, funny, and well behaved. I have also heard many stories of Dane staying behind to help other students and even many teachers with their technology problems.

The quality I most attribute to my brother is resilience. Dane has struggled all throughout his life. At a young age I remember my brother struggling in school and working his hardest to improve. He has had a difficult time making friends due to the introversion of his personality. As he grew his problems grew more severe. He has struggled with the pains of Chron's disease, the overwhelming financial hardships caused by student loans, and the ineffable depression imposing on his life. Throughout everything Dane has consistently proven his ability to learn, adapt, and grow.

As I previously mentioned, I have not had much communication with my brother since I learned of his arrest and the circumstances surrounding the event. However, I believe at his core Dane is the same thoughtful, kind, and resilient person I have always known him to be. I believe him when he expresses regret for what he has done and allowed to happen. I trust his ability to learn from and not repeat the same mistakes. Furthermore, I have confidence that he has seen the importance of seeking out help when being crushed by the weight of his troubles in an effort to keep his mind clear and his morals intact.

Attachment C

Dane has played a truly significant role in my life and though I have tried my best I do not think I could ever possibly re-count all the ways in which he has impacted my life for the better. I will always support and love my brother. I will always have faith in his capacity to learn. Most importantly I will always trust that in his heart he is the Dane I have always known.

Christa Falte
Christa Falte

USCA4 Appeal: 17-4630    Doc: 21    Filed: 02/12/2018    Pg: 98 of 146

Aug. 18. 2017 10:15AM                                                No. 3647   P. 2

## VANDERBILT UNIVERSITY  MEDICAL CENTER

*Inflammatory Bowel Disease Clinic*

August 18, 2017

ATTN: Honorable Judge of the United States District Court

RE: Patrick Dane Falte

To Whom It May Concern,

I care for Mr. Falte for his severe Crohn's disease. He has already required abdominal surgery for this and needs methotrexate (a pill) and infliximab (an IV infusion that has to be given at an infusion center every 6-8 weeks) to maintain remission. Without these, he will become extremely sick with abdominal pain, diarrhea, fevers, may have bowel obstruction, need to be hospitalized. He also needs frequent lab monitoring (every 3 months) and doctor's visits (at least every 3 months) to me for me to continue to write these medications as they are immunosuppressant's and can have side effects I must monitor closely. Please allow his care to continue uninterrupted and contact me with any questions at 615-343-4758.

Sincerely,

Sara Horst, MD, MPH
Inflammatory Bowel Disease Center
Vanderbilt University Medical Center

SH/dw

1211 21st Avenue South         tel   615.322.0128
Medical Arts Building, Suite 220   fax  615.936.6977
Nashville, TN 37212-2702        www.VanderbiltHealth.com

J.A. 94                                                    Attachment E

# CAN YOU CATCH MADNESS?

SMART

# Psychology Today

PSYCHOLOGYTODAY.COM / DECEMBER 2015

NERD

# HOW DO

WEIRD

LEADER

# PEOPLE

INTENSE

# SEE YOU?

## THE TRUTH ABOUT FIRST IMPRESSIONS

**LONG-LOST SISTERS**
**ONE FAMILY'S**
**AMAZING SAGA**

**THE TRAITS YOU TRULY**
**NEED IN A PARTNER**

**DO WE MISUNDERSTAND**
**SEX OFFENDERS?**

Attachment F



# SYMPATHY
# FOR THE
# DEVIANT

THE INTENSE STIGMA SURROUNDING CHILD SEXUAL ABUSE
CLOUDS AN ALREADY MISUNDERSTOOD SUBJECT AND MAY EVEN
PREVENT PEOPLE FROM GETTING HELP BEFORE THEY COMMIT
HARM. ONE CONVICTED OFFENDER SHARES HIS STORY.

BY **JENNIFER BLEYER**     PHOTOGRAPHS BY **REINHARD HUNGER**

**J.A. 96**

# ONE FRIDAY EVENING

In September 2009, a pair of detectives showed up at the house of a middle-school gym teacher named Evelyn* and asked to speak with her husband, Eugene. A soft-spoken woman with rosy cheeks and tidy bangs, Evelyn told them he was at the small airport three miles away where he worked as a part-time flight instructor. They wouldn't say what their inquiry was about, and they asked her not to call him. Always deferential to authority, she invited them to wait inside.

Sitting in awkward silence, Evelyn strained to imagine why they were there. Eugene was a respected member of the community—a former U.S. Navy navigator who, after his enlistment, had become a Methodist minister. He was, by all accounts, a compassionate counselor to parishioners going through rocky times, a generous mentor to young people, a supportive ally of his colleagues, and a caring father to his and Evelyn's twins, then in their 20s. He was self-effacing and humble—it could take years of acquaintance before he would mention that he once led worship services for President Reagan at Camp David.

Evelyn felt a knot of dread in her stomach. She wondered if this had something to do with a strange brush with the law Eugene had had two years earlier, after he retired from the ministry and returned to his earliest passion, flying airplanes. A complaint had been lodged about inappropriate conduct with one of his flight students, a 14-year-old boy. The boy had told police that when they were flying, Eugene had touched his thigh and, another time, had tried to kiss him. The complaint was referred to the district attorney's office, which declined to pursue it due to insufficient evidence. Eugene had told Evelyn that it was a misunderstanding—a single-engine propeller airplane is extremely tight quarters and he was just trying to help the boy, who said he had a leg cramp. Still, he was devastated by the accusation and agreed with Evelyn to seek help through a Christian counseling service. He spoke vaguely with a counselor about feeling anxious and depressed.

Evelyn heard a car pull up outside. Trim and silver-haired at 64, Eugene strode in through the garage. He froze when he saw the detectives, whom he recognized from his work as a volunteer chaplain for the police department. The detectives announced that they had a search warrant and collected his cell phone, digital camera, computers, and thumb drive. They asked him to come down to the police station; he opted to go right away. Before leaving, he stood with Evelyn for a fraught moment and told her point-blank that he had had inappropriate contact with a family friend's 13-year-old son, whom he had taken under his

*The couple are referred to by their middle names.

wing in the past year, offering him flight lessons and treating him to special outings. He left, and Evelyn started to wail.

## CROSSING THE LINE

"I KNEW WHY the police were there as soon as I saw them," Eugene told me six years later. "I was devastated, but a part of me was also enormously relieved to just be done with this."

After leaving the ministry, he had begun to notice an attraction to early adolescents that was "totally uncomfortable," he said. It was a feeling that had nagged at the edge of his consciousness before, a kind of nebulous allure that had never led to any improper behavior. Suddenly, he found himself spending more and more time with certain young teenagers, feeling obsessed with them, and inching toward a line he knew he shouldn't cross.

"It was progressive," he told me. "It went from skinny dipping, to sleeping nude, to embracing and searching for a full-blown 'relationship.' I did not at the time identify what was



CALLING SEX OFFENDERS MONSTERS BLINDS US TO PEOPLE IN OUR LIVES WHO ENGAGE IN INAPPROPRIATE BEHAVIORS.

going on, but I knew deep down inside that something was wrong. I can't tell you the number of times I told myself, 'Eugene, you're 64. What are you doing looking for a relationship with a 13-year-old?' But it was like being an alcoholic where the drive for pleasure becomes overriding. And where could I go for help? Whom could I trust? I knew how society views pedophiles. I was already full of shame, and those kinds of stories only fueled my shame more."

When Eugene showed up at the police station, the accusations were enumerated: The boy in question had told authorities that on several occasions when the two were "camping" inside a tent in a hangar at the airport, they had slept beside each other while Eugene was completely nude, and Eugene had touched the boy's buttocks. The boy also said that Eugene had taken photographs of him in just his underwear and a shirt—pictures that were discovered on the thumb drive. After confirming the allegations, Eugene was arrested and charged with indecent assault, indecent exposure, and corruption of a minor.

Reports of his arrest were soon all over the local news. His friends and colleagues at the airport were stunned, as was everyone at his church, where he was a Sunday service regular and an active member of a Bible study group. Released on bail, he shuttered himself in his house and descended into nearly suicidal despair. Evelyn also became depressed. She anguished over why she hadn't more clearly recognized that something was amiss and intervened. "I saw that he was spending more and more time with particular young people, and in some ways it seemed like an obsession," she told me. "But I had no clue what it

was. You think the best of people until you find out differently."

The police, meanwhile, reopened the investigation sparked by the first boy, which resulted in an additional corruption charge. Authorities also pressed the second boy for more information, which turned up new accusations of oral sex and masturbation, bringing even more serious criminal charges. In December, the district attorney held a televised press conference asking for anybody else whose child may have had contact with Eugene to come forward. "It's a sobering warning to all parents in our community," he said. "Know who your children are with, because predators like this are out there."

## WHO, WHY, HOW?

FEW CRIMES ELICIT as much moral outrage as child sexual abuse. Long shrouded in silence, it began to emerge from the shadows in the 1980s, as an increasingly confessional culture spurred survivors to speak out. For the first time, both its prevalence and its adverse effects became apparent. The pendulum of public concern swung hard in the direction of indignation, as sexual abuse went from being largely ignored to intensely condemned.

A series of sex-offender management policies were instituted across the country, mostly in response to a few grisly, sexually motivated child abductions and murders that captured headlines and terrorized parents. Such crimes are exceedingly rare, yet the extreme fear they provoke made it easy for policy makers to create public sex offender registries and pass ever-tightening restrictions on offenders in the hope that these strategies would make children safe.

Critics contend that such policies have fueled a mostly unwarranted fear of strangers, and obscured the visibility of sexual abuse where it primarily occurs: in 95 percent of identified cases, at the hands of someone trusted and well known to the victim; a third of the time, by a member of the child's own family. "Sex offenders are in fact people all around us," says Elizabeth Letourneau, director of the Moore Center for the Prevention of Child Sexual Abuse at Johns Hopkins University. "It's very easy to call them monsters, but doing so literally blinds us to when the people in our lives are engaging in inappropriate behaviors."

Critics also claim that the safeguards have fueled the misperception that sex offenders are uniquely unstoppable. In reality, recidivism rates for sex offenses are lower than for all other major types of crime and much lower than commonly believed. The Department of Justice has found that only about 3 percent of child molesters commit another sex crime within three years of being released from prison, and meta-analysis of



PEDOPHILIA REFERS ONLY TO A PREFERENTIAL ATTRACTION TO MINORS, NOT TO A BEHAVIOR.

hundreds of studies has confirmed that once they are detected, most convicted offenders never sexually reoffend.

There is no simple explanation for what triggers such behaviors. Pedophilia is part of the answer, although only about 40 percent of convicted sex offenders meet the diagnostic criteria for the disorder, which is characterized by an intense, recurrent, and involuntary sexual attraction to children, and which may have biological origins in some cases. Pedophiles have been shown to be shorter on average and are more likely to be left-handed, as well as to have lower IQs than the general population. Brain scans indicate that they have less white matter, and the connective circuitry in the brain, and at least one study has shown they are more likely to have suffered childhood head injuries than non-pedophiles.

Whatever its source, researchers emphasize that pedophilia refers only to an attraction to minors, not to a behavior. "There are people who have the disorder of pedophilia but do not molest children," says Jill Levenson, an associate professor of social work at Barry University in Florida who treats and studies sex offenders. "I've certainly met people who have resisted acting on these sexual interests because they know it's wrong, they don't want to harm children, and they understand how it will affect their own families and the families of victims."

For most sex offenders, the impulse to abuse emerges from a murky tangle of environmental, social, and psychological threads rather than, or in addition to, pedophilia. Levenson points to alcohol abuse as a means of comparison. "We know that not every person convicted of drunk driving meets the criteria for alcoholism," she says. "There are people who might have a lapse in judgment or maybe a discrete period in their life where they were using too much alcohol to deal with their problems. The same is true with sex crimes. There are a variety of reasons why they happen, and not all of them are about sexually deviant interests."

One such reason is that many abusers suffered sexual abuse themselves as children, which can act as a conditioning experience in their sexual development. Others have behavioral regulation problems, and their compulsiveness can extend toward child abuse if the situation presents itself, even if they are not normally attracted to children. And many, research has shown, have pronounced feelings of humiliation, rejection, inadequacy, fear, guilt, and low self-esteem, and they abuse as a maladaptive way of dealing with their own painful emotions.

"There's often a cascade of negative events," Letourneau says. "We see this with teachers a lot, where things are going poorly in other areas of life, and something causes them to doubt their self-worth, and then they're spending more and more time

with kids who have this unqualified adoration and caring for them, and they convince themselves they're falling in love. It doesn't seem to be a preferential attraction. Circumstances arise that are very idiosyncratic to a particular situation."

As his troubling urges brewed, Eugene was too ashamed to breathe a word about them to anyone. The only silver lining after his arrest, in fact, was that he finally felt free to open up. He saw a clinical psychologist for six months, during which time he came to realize that while he still loved Evelyn, they had grown apart to the point of leading parallel lives, leaving him emotionally adrift. He recognized how the firm institutional boundaries of the military and the church had kept him from crossing a line earlier, whereas as a flight instructor he was faced with a level of proximity and privacy with kids that he had never experienced before. Their innocent admiration of him as a talented pilot felt intoxicating. Perhaps most important, he examined his upbringing in a strict, religious family and the deep insecurity instilled by his verbally and emotionally abusive father.

"I was only afforded time to scratch the surface, but it was very helpful," he says. "I wish I'd known even a small part of what I learned in my brief time in counseling before I did what I did."

Levenson says that while there are countless routes to sexual offending, and the majority of men with low self-worth are certainly not destined to become child molesters, there's often a common denominator in men who feel fundamentally bad about themselves and go on to develop close emotional connections with minors.

"Many don't have very good avenues for self-esteem, and they seem to fall in love with a particular child who makes them feel special and important and doesn't have the same kinds of expectations and judgments an adult would," she says. "I'm not excusing or condoning it, but it's important to realize that the pathway is really similar to the way the rest of us experience relationships. It's about emotional intimacy that gets sexualized."

Most offenders are stopped only after they've careened all the way down that path and children have been harmed. The challenge from a prevention perspective is both to recognize that arriving at that point is not inevitable, and to offer secure off-ramps before they get there.

"Things don't 'just happen,'" says Charles Flinton, a forensic psychologist in San Francisco who provides court-mandated therapy to sex offenders and conducts evaluations to determine their risk status. "It builds up over time. Let's say somebody finds himself sexually attracted to children. He may start by looking at magazines or catalogs with kids in bathing suits. He's a little nervous, and then he becomes desensitized to that nervousness.

He may start creating arguments in his head that it's OK to put himself in situations with kids or to prepare children to be more comfortable around him in what would otherwise be awkward situations. With each step, he moves toward offense behavior. Most are able to identify a point at which there's a fork in the road."

Unlike other kinds of risky behavior, however, the secret nature of their attraction leaves no opportunity for intervention, let alone empathy for whatever internal struggle they may be engaged in to control themselves. What's more, the profound stigma that surrounds sexual attraction to children actually ends up abetting the very behavior it stigmatizes, amounting to a catch-22 with abhorrent consequences. "People with a sexual interest in children don't have any reality check to bounce up against," Flinton says. "We engage in sexual decision making, as with any decision making, by communicating and interacting with others about our dilemmas. But these people are totally isolated, which only increases their risk of acting out. They become entrenched in a double life that's hard to escape."

The isolation is ultimately more dangerous than the feelings themselves, says Joan Tabachnick, co-chair of the prevention committee of the Association for the Treatment of Sexual Abusers. "Sex abuse thrives in isolation, and shame sets the isolation in concrete," she says. "If we can begin to break apart that shame and isolation, we'll be much more likely to intervene earlier in the cycle. The environment that allows sex abuse to thrive would be eroded."



"SEX ABUSE THRIVES IN ISOLATION, AND SHAME SETS THE ISOLATION IN CONCRETE."

## THE RIPPLE OF STIGMA

IN MARCH 2010, Eugene appeared before a judge at the county courthouse and accepted a plea agreement. He was sentenced to eight to 20 years in prison. He was also designated a sexually violent predator—based on a 12-minute interview with a forensic expert—which means that after his release, at age 73 at the earliest, he will be on the sex offender registry for the rest of his life.

Gathered in the courtroom were his family and friends, including fellow pilots and Methodist clergy who had known him for decades and who testified that while his crimes were indefensible, and their hearts ached for his victims, the Eugene they knew was a fundamentally virtuous person who had done incalculable good in the six decades prior to his offenses and had, one friend said, a "deep desire to defeat this illness." The last to stand and speak on his behalf was Evelyn.

"I could have easily abandoned my husband, like some would," she said. "Our family stands by his side today because of a lesson I have learned in life. We all make mistakes. We all have compulsions. We all have a side of us that we're afraid to show

others, and we all need compassion and forgiveness."

The dense mass of stigma surrounding sexual abuse not only deflects compassion for potential abusers but it erects particular barriers that prevent them from getting help. Levenson surveyed convicted offenders about these barriers, and "the first thing they say is that they really had no idea where to go," she says. "They see all these public health announcements: 'If you have a drug problem, or a gambling problem, or you think you have HIV, call this number.' But you never see a bus go by with an ad that says: 'If you're concerned about your attractions to children, call this number.' Another reason is the very shame and fear of judgment—'If I open up and tell somebody, what are they going to think of me?'"

People attracted to juveniles also internalize the message that they can't be cured. "When they open a newspaper or turn on the TV, they hear the same message that you and I do—that sex offenders are monsters who will always reoffend," Levenson says. "Are there people who are attracted to kids? Yes. Can we change that attraction? For some, no, although they can choose not to act on it. But if somebody believes he can't be cured, he's not going to ask for help."

The final obstacle cited by almost everyone is the very real fear of legal consequences. Mandatory reporting legislation requires certain licensed professionals, including doctors, teachers, psychotherapists, and social workers, to report suspected cases of child abuse or neglect to child welfare authorities. The laws are federally mandated, and although they differ somewhat among jurisdictions, the intent and requirement are the same everywhere and have a clearly good purpose: to protect children from harm. In many states, the failure to report is a misdemeanor punishable by imprisonment and fines.

Mandatory reporting laws are credited with facilitating a decrease in all kinds of abuse and neglect over the past several decades. In the case of sexual abuse, however, they have had the inadvertent effect of making it very hard for someone who is attracted to children, and who may even be inching along the pathway toward abuse—by looking at child pornography, for instance, or touching a kid's thigh, as Eugene did—to ask for help without risking the infamy of being identified. "Self-preservation steps in," Levenson says. "Even if they've never acted on them, men who are concerned about their attractions are reluctant to seek counseling, because they're afraid they're going to be reported."

Even admissions that fall within the limits of confidentiality in psychological treatment are seldom voiced because of confusion and fear. "If someone comes in and says, 'I've been looking at pictures of children in bathing suits in a Macy's catalog,' that's not usually something that would have to be reported," Levenson explains. But the actual details about what requires a report—in many states, an identifiable child has to be endangered—tend to be overlooked within the overall climate of vilification and punishment, she says. People are terrified to admit to anything, whether or not their admission would really necessitate a report. "There are absolutely people who have started down the road of offending who want to stop," Letourneau says. "They don't get help, because between mandatory reporting and lifetime sex offender registration, the consequences are too much to bear."

## SAFE OFF-RAMPS

WHEN CLINICIANS CONSIDER what an effective prevention approach to sexual abuse might look like, many point to an initiative in Germany called Prevention Project Dunkelfeld. Begun in 2005, the program aims to prevent abuse by



"YOU HAVE TO GET THESE GUYS IN THE DOOR TO BE ABLE TO PREVENT VICTIMS."

offering anonymous treatment to people who are sexually attracted to pubescent and prepubescent children. The program is advertised in slick media campaigns. In one TV spot, a series of masked men in varied dress—a suit and tie, a tracksuit, a grandfatherly sweater vest—recite a script of internal dialogue: "It's obvious what you think of the likes of me. Sicko! Pervert! Scum! I thought so too. In therapy I learned that no one is to blame for his sexual preference, but everyone is responsible for his behavior." The last man removes his mask, revealing a typical looking guy. "I don't want to be an offender!" he says.

Over 5,000 people have come forward seeking services, and there are now 11 Prevention Project Dunkelfeld clinics in Germany, which use cognitive behavioral methodology to teach clients how to control their sexual impulses. The clinic also offers psychopharmaceutical interventions, including, when needed, testosterone-lowering medication that dampens sexual appetite. The project's initial results are based on very small samples but appear encouraging: Participants have been shown to experience improvements in their self-regulation abilities and decreases in attitudes that support sexual contact with children. More critical, Letourneau says, is what's indicated by the sheer fact of those who've reached out for support: "That you have this group of people who may have been white-knuckling it themselves, and who are willing to identify as wanting and needing help, supports at least the promise of prevention."

SYMPATHY FOR THE DEVIANT *continued on* page 86

THERAPISTS: *Interested in receiving Continuing Ed credit for reading this article? Visit* NBCC.org

**J.A. 100**

**SYMPATHY FOR THE DEVIANT** *continued from* **page** 67

Controversially, however, there are no mandatory reporting laws in Germany, so even someone actively abusing an identifiable child can get help and remain anonymous. Nobody seriously proposes doing away with mandatory reporting in the U.S., although some think it should be modified to encourage people to get help much earlier in the offense trajectory. But even if help were possible to pursue, it's unclear where one would get it. As Levenson points out, there are no public service announcements pointing to resources for dealing with such urges. And mental health professionals, fuzzy about their own legal obligations and nervous about their liability, have been known to shirk potential clients who want therapy.

"A lot of sex offenders I've worked with knew they had a problem before they acted out illegally; they sought assistance and were turned down," Flinton says. "Therapists reject them, saying, 'I can't work with you' or 'You can't tell me this.' It's infuriating, really, because a crime could have been prevented, and these guys could have ended up living productive lives."

In recent years, Flinton has himself been contacted by more and more men in this position: "They call me saying, 'I'm having sexual fantasies about children, and I don't want to—what do I do?' Or it's often their wife or girlfriend who calls out of concern. They say their partner isn't really present, that he's missing a lot of family time or spending hours a day looking at pornography and seems to be building a double life."

In 2013, Flinton opened a Bay Area clinic called the Blue Rock Institute. Although the clinic has received only about 100 clients so far, it represents a hopeful example of what proactive prevention of sexual abuse could look like. While vigilant about making mandated reports when required, the clinic primarily reaches men who describe deviant fantasies, but who haven't yet crossed the line of illegal behavior. The treatment model is very similar to interventions for addiction: As with substance abuse, Flinton explains, sexually abusive behavior is often something people engage in to suppress negative feelings. The clinic's therapeutic focus is on addressing the underlying source of those feelings, many times in family dynamics or early traumatic experiences, as well as on helping people work past their shame, comprehend how distorted thought patterns can reinforce unhealthy sexual behavior, and learn how to meet their needs in healthy ways.

"We want these guys feeling safe to look at themselves and understand their problem," Flinton says. "They often have a lot of internal strengths. It's about identifying those and capitalizing on them, while still holding the men accountable. Our



"WE HELP POTENTIAL OFFENDERS CAPITALIZE ON THEIR STRENGTHS, WHILE STILL HOLDING THEM ACCOUNTABLE."

goal is to prevent victims. You have to get these guys in the door to be able to do that."

AFTER HE WAS SENTENCED, Eugene spent two years in a county jail before being moved to a large state penitentiary. Evelyn travels two hours to visit him there once a week, and on a dazzling summer morning, I went along with her. We drove on a narrow road lined with strip malls and industrial facilities until we arrived at a vast expanse of manicured grass and dogwood trees that brought to mind a college campus. At its center was a complex of boxy buildings surrounded by towers of barbed wire.

Eugene, in a maroon jumpsuit and wire-rim glasses, beamed when he walked into the visitation room and saw Evelyn. They kissed and hugged tightly. "He's still the same person I married 33 years ago, the same person I know and love," she said. "Just the fact that we can talk about what happened is a step in the right direction. If we're not able to talk about it, there's no way to change."

They made the rounds of the room's vending machines to gather their usual visiting day provisions— pretzels, chips, shrink-wrapped deli sandwiches, sodas— and we settled into a corner to eat. Eugene spoke with enthusiasm about his job as an inmate assistant in the prison's sex-offender therapy program. Having completed the program himself, he now works with a staff psychologist several days a week, helping facilitate group sessions in which other offenders detail their offense trajectories, do exercises to cultivate empathy for their victims, learn behavioral-modification techniques, and craft relapse-prevention plans. In listening to their stories, and ruminating on his own, he has developed a certain zealousness for the need to reach people before they do the things that land them in prison.

"I take full responsibility for my actions," he said. "Yes, I am a sex offender. Yes, I live with this desire and will live with it for the rest of my life. But surely it must be possible to construct some sort of framework of help for men like me that does not end with victims and prison."

One place where such a framework is being attempted is in his own church. Eugene's face reddened and tears glazed his eyes as he told me about a recent phone call with a church officer in charge of an effort to extend confidential support to clergy coping with an attraction to children—an effort that was galvanized in the eye-opening aftermath of Eugene's transgressions. The church officer told him that a minister and a ministry student had recently come forward for counseling. "Hearing that makes this all worthwhile," Eugene said. "If my story can in some way help prevent some terrible offense, then the journey has been worth it." **P**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Richmond Division

 3

 4

 5

 6    THE UNITED STATES OF AMERICA,

 7                                        Plaintiff,

 8         versus                                  3:17CR49

 9    PATRICK FALTE,

10                                        Defendant

11

12

13

14         Before:  HONORABLE JOHN A. GIBNEY, JR.
                   United's States District Judge
15

16

17

18

19                      September 15, 2017

20                      Richmond, Virginia

21

22

23              GILBERT F. HALASZ
                Official Court Reporter
24              U. S. Courthouse
                701 East Broad Street
25              Richmond, VA 23219
```

**J.A. 102**

2

```
 1

 2

 3                          APPEARANCES

 4

 5                      Jessica Aber, Esq.
                        Elham Peirson, Esq.
 6            Assistant United States Attorney
                      For the United States
 7

 8

 9                      Carolyn Grady, Esq.
               Assistant Public Defender
10                      for the defendant

11                       The Defendant
              In his/her own proper person
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          THE CLERK:  Case number 3:17 CR 49.

2          United States versus Patrick Falte.

3          Ms Jessica Aber and Ms Elham Peirson represent the

4     United States.

5          Ms Carolyn Grady represents the defendant.

6          Are counsel ready to proceed?

7          MS ABER:  United is ready.

8          MS GRADY:  Defense is ready.

9          THE COURT:  All right.

10          Good morning to Ms Peirson and Ms Aber and Ms Grady

11     and Mr. Falte.

12          Is it Falte or Falte?

13          THE DEFENDANT:  Falte.

14          THE COURT:  Falte.  All right.  Well, good morning,

15     sir.

16          All right.  Ms Grady, have you and Mr. Falte had a

17     chance to review the presentence report and to discuss it?

18          MS GRADY:  Yes, we have, Judge.

19          THE COURT:  And do you have any unresolved objections

20     to the report?

21          MS GRADY:  No, we do not.

22          THE COURT:  All right.

23          And the government have any objections?

24          MS ABER:  No, Your Honor.

25          THE COURT:  All right.

4

1      So here is how the presentence report works out with

2    the guidelines.

3      The base offense level is 42 points, which is

4    computed as follows:  Thirty-two points for the basic

5    offense, plus four four because the victim was under 12

6    years old, plus two because there was sexual contact, plus

7    two because there was distribution of the photographs or

8    images, plus two because a computer was used.

9      All right.  That is 42.

10     Then there is a five-point enhancement, which really

11   is impossible to explain in words, but it is due to the

12   nature of the crime in this case, and under the

13   guidelines, leading to a total adjusted offense level of

14   47.  Mr. Falte gets three points off for acceptance of

15   responsibility.  I will grant the government's motion to

16   take off the third point.  For a total offense level of --

17   well, it would be 44, but the maximum is 43, so it is 43.

18     He has zero criminal history points, and category

19   one.  Guideline sentencing range is therefore life.  The

20   guidelines, of course, are advisory only.

21     I have received some letters in this case.  Received

22   this morning a letter from Mr. Falte himself, which

23   expresses his regret over the offense and the fact that he

24   understands how he harmed the child in this case.

25     I have got a letter from Janet Falte.

**J.A. 105**

5

1        Ms Grady, is that his grandmother or great

2   grandmother?

3        MS GRADY:  It is his father's ex-stepmother.  His

4   father's new wife, after his father's mother died.  Or

5   father's wife.

6        THE COURT:  So it is his step grandmother then?

7        MS GRADY:  Essentially, yes.

8        THE COURT:  Anyhow, from his grandmother, Janet

9   Falte.

10        From his mother and his father.  From his sisters, or

11   sister, rather, his -- essentially those letters from

12   family members discuss the fact that he is kind and

13   helpful to others.  And that they still love him.  And

14   reiterates some of the issues that he has had in his life

15   in terms of depression and difficulties dealing with that

16   in school and so forth.

17        I also have a letter from his doctor at Vanderbilt

18   dealing with his Crohn's disease, which is obviously real

19   and requires continued treatment.

20        I also have received statements from the mother and

21   grandmother of the victim in this case, the child.  And

22   those letters discuss the horrible effect of Mr. Falte's

23   and Mr. Faulkner's actions on the child, which I don't

24   think means -- Mr. Falte doesn't deny that.

25        Okay.  Let's see.  Do you have any witnesses?

**J.A. 106**

```
 1            MS ABER:  No, Your Honor.

 2            THE COURT:  Okay.

 3            Do you have any witnesses?

 4            MS GRADY:  I just have one, Your Honor.

 5            THE COURT:  All right.

 6            Let's hear the witness.

 7            MS GRADY:  Charles Falte, please.

 8                         CHARLES FALTE

 9              WAS SWORN AND TESTIFIED AS FOLLOWS:

10                       DIRECT EXAMINATION

11   BY MS GRADY:

12            THE COURT:  All right.

13            Good morning, Mr. Falte.  Thank you for coming, sir.

14   Q    Please introduce yourself to The Court.

15   A    Charles Falte.  I am Patrick's father.

16   Q    You go by?

17   A    Pete.

18   Q    Pete.  Did you write a letter in this case?

19   A    I did, yes.

20   Q    Okay.  And you are, obviously, you call him Patrick.

21   What is his nickname?

22   A    Ding.

23   Q    Ding.  You obviously traveled from somewhere today.

24   Where did you come from?

25   A    Nashville, Tennessee.  Franklin.  Just south of
```

1   Nashville.

2   Q    Who else came with you?

3   A    My wife, Patricia.

4   Q    What about your daughter, Christa?

5   A    Due to work, she had to remain where she is at in

6   Nashville.

7   Q    Okay.  Did she want to come today?

8   A    She -- it is tough for her.  She works in child care.

9   So it is hard for her to be here, but she still loves her

10  brother.

11  Q    Okay.

12       Why did you come here today?

13  A    To support my son and help in any way with his

14  sentencing, kind of show the positive side that we have

15  seen in our son.  We have not seen this portion of him.

16  Q    Tell The Court a little bit about the positive sides

17  of your son.

18  A    We know him to be loving and helpful.  He has always,

19  you know, been more of an introvert.  We have known that.

20  But we have known the loving side.  He has been very

21  helpful to neighbors, ourselves, we go to Second Harvest

22  Food Bank once every year or two to, you know, community

23  volunteer service.  Things of that nature.

24  Q    You all are involved in the church, are you not?

25  A    We are involved, yes.

Falte - direct                                    8

1    Q      Okay.

2           What are you asking The Court to do for your son?

3    Obviously, he has to sentence him.

4    A      I understand the pain that is going on from the other

5    side.  And, you know, that is where I would be if I were

6    in their position.

7           I just hope today is not about vengeance or anything

8    like that.  It is the legal system, and I hope they see

9    that my son is worthy of a second opportunity at some

10   point in his life.

11   Q      Okay.  Thank you.

12          Answer -- anything else you want to tell The Judge

13   today that you didn't write in the letter?

14   A      No.  That is it.

15          THE COURT:  All right.

16          MS GRADY:  Answer any questions the Judge or

17   government has.

18          MS ABER:  No questions, Your Honor.

19          THE COURT:  Mr. Falte, thank you very much for

20   coming.

21                    (Witness stood aside)

22          Let me say to -- you can go back in the audience.

23          Did you identify the Falte family members who are

24   here?

25          MS GRADY:  Yes, sir, Judge.  I apologize.

9

1          The woman who stands up, that his mother, Patricia

2     Falte.  And next to them are the Faulkners, who traveled

3     from Canada today.

4          THE COURT:  All right.

5          Well, thank you both for coming, to the Faltes.

6          MS GRADY:  Defense has no further witnesses, Your

7     Honor.

8          THE COURT:  Okay.

9          Any other evidence from either side?

10         MS ABER:  No, Your Honor.

11         MS GRADY:  Nothing from defense.

12         THE COURT:  Let me say to the Faltes, thank you.

13    This is, obviously, not a good day in your life, or in

14    Ding's life.  But thank you very much for coming.  It

15    means a lot to him to have you here.  So thank you for

16    coming.

17         All right.  So let's hear from the government then on

18    the request for variance, the 3553(a) factors, and the

19    appropriate sentence in this case.

20         Why don't you tell me who is here from the family of

21    the victim, or supporting the victim.

22         MS ABER:  Yes, Your Honor.  The two individuals in

23    the second row next to Mrs. Ulmet are relatives of

24    Mr. Faulkner.  Other than that, we have investigative

25    agent and other folks here to observe.

**J.A. 110**

1          THE COURT:  Okay.

2          So the mother and the grandmother are not here?

3          MS ABER:  That's correct, Your Honor.

4          THE COURT:  Okay.

5          MS ABER:  They didn't want to be here at the end

6     because this is such a --

7          THE COURT:  I understand.

8          MS ABER:  Okay.

9          So for the reasons outlined in our sentencing

10    position, and in our sealed pleadings, a sentence of 50

11    years, which is just short of life imprisonment for a

12    27-year-old here, that meets the factors of 18 USC 3553

13    (a).  The variant sentence of 30 years, as Mr. Falte

14    proposes is insufficient to achieve the objectives of the

15    statute.  And I don't mean to be beat a dead horse, Your

16    Honor, but against the defendant's regret, which is

17    apparent in his letter, and his family, the horrible

18    situation this is, the obvious good side of Mr. Falte, we

19    have the nature and circumstances of this offense, which

20    is truly horrific.

21          Traveling repeatedly across state lines to rape a

22    toddler is unconscionable, but they also -- when I say

23    "they" I mean both Mr. Falte and Mr. Faulkner -- spent

24    time in this district grooming this child.  And, in fact,

25    Mr. Falte's letter alludes to that, buying the child toys,

**J.A. 111**

1    buying her ice cream to make her comfortable.  And they

2    photographed the abuse.  I have seen those pictures and

3    videos, and it is horrific.  And they put those on the web

4    site for other pedophiles to watch.  In honest, truth,

5    Your Honor, those photos will exist in perpetuity on the

6    internet for other pedophiles to watch.  That kind of

7    thought is really, I think what probably is the nub of how

8    offensive this is to the mother and grandmother, setting

9    aside the physical pain that their daughter and grand

10   daughter endured.  And I won't read it, obviously, but the

11   mother has a very interesting statement at the end of her

12   victim impact statement about how she is had images in her

13   head of what I was told you, Mr. Falte, and your friend,

14   did to her fragile little body.  As her mother my heart

15   breaks.  The evil you brought into my child's life is in

16   indescribable.  That is why she asks this court to

17   sentence Mr. Falte to life imprisonment.

18       A thirty year sentence does not, does not serve the

19   remaining factors of 3553(a).  It doesn't reflect the

20   seriousness of the offense.  It doesn't promote respect

21   for the law or promote just punishment.  The cruel

22   physical abuse of the youngest and most vulnerable is a

23   among the most serious crimes in the United States Code.

24   And that, Your Honor, is why thirty years is the mandatory

25   minimum, and the guidelines are life.

**J.A. 112**

1          In fact, upon preparing for this sentencing yesterday

2     I was thinking about if I polled a hundred people on Broad

3     Street I am guessing the vast majority would say life

4     imprisonment, or even worse, would be an appropriate

5     sentence for this crime.

6          A thirty year sentence is not about vengeance, it is

7     about -- excuse me, fifty year sentence is not about

8     vengeance, a thirty year sentence will not adequately

9     protect the public from further crimes of the defendant.

10         Ms Grady has provided a very interesting

11    psychological report to The Court.

12         THE COURT:  I have read it.

13         MS ABER:  And having prosecuted many child

14    pornography cases, I am interested in what a psychologist

15    would say about someone like Mr. Falte who has these kinds

16    of clear proclivities towards this activity.  But at the

17    heart of the psychologist's opinion is that Mr. Falte at

18    best would be most similar to individuals who are average

19    risk of re-offense upon release.  So even assuming that is

20    true, and even assuming Mr. Falte is amenable to the sort

21    of sex offender treatment the psychologist proposes, it

22    strikes me as an unacceptable risk to the community.

23         THE COURT:  I think what she says is that a very low

24    risk of reoffending, and among the potentially offenders

25    he is sort of in the middle rank.  So, it is not like it

**J.A. 113**

1    is a high risk, but virtually any risk is unacceptable.

2        MS ABER:  Exactly.  I mean who wants their child to

3    be the part of the low risk of recidivism?  In fact, that

4    is borne out by Mr. Falte's communications that are listed

5    in the PSR with another pedophile reflecting that he might

6    like to go out and spot kids or adopt or foster children.

7    I mean that kind of risk is not someone we can release in

8    their late or early 50s, which is what Mr. Falte proposes.

9    30 year sentence would have him released at approximately

10   53, with good behavior.  But a 50 year sentence assumed

11   that he will be released at almost 70 years old.  And with

12   inevitable sex offender monitoring, supervised release, he

13   would presumably provide -- would provide sufficient

14   assurance that he will not harm another child.

15       THE COURT:  Well, I can assure you that as people

16   approach their 70s they still have active sexual lives and

17   desires and so forth.

18       MS ABER:  I'm not going to comment on that, Your

19   Honor.  But I will add that I think at that point in his

20   life there are sufficient ways, and who knows what sex

21   offender monitoring would be like in the year 2087.

22       THE COURT:  It would be a different world then.  You

23   know, one of the things that just troubles me about this

24   case is that right now the world of treatment for people

25   like Mr. Falte is pretty primitive.  But who knows what it

14

 1    is going to be in 30 years or so.  Maybe there will be

 2    something that will help him in dramatically different

 3    ways than what we have now.  But there is no guarantee of

 4    that, is there?  Not even, doesn't even seem to be a lot

 5    of work going on in that area.  But, go ahead.

 6         MS ABER:  Well, the bottom line is, Your Honor, I

 7    think we have to sentence Mr. Falte on the information we

 8    have now before us.  That is, that he is a public safety

 9    risk, that we need to incapacitate him as long as

10    possible.  But based on the information provided in our

11    sealed pleadings he does deserve some hope of ultimate

12    release.  That is why a 50 year sentence is most

13    appropriate an meets the factors of 3553(a.

14         Thank you.

15         THE COURT:  Thank you very much.

16         Ms Grady.

17         MS GRADY:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MS GRADY:  Some of the direct responses to The

20    Court's concerns and the government's arguments for me

21    would be that The Court is obviously concerned about one

22    of the factors, which is how to protect society.  And

23    talking about Mr. Falte's being a low risk or an average

24    person in the low risk category, which is what the

25    evaluation turns out to be, to opine, Judge, in 30 years,

**J.A. 115**

1    as you well realize, we don't know what the world is going

2    to be like.  What we do know from the evaluation is that

3    Mr. Falte is amenable to treatment.  The doctor found a

4    number of factors that showed that Mr. Falte is amenable

5    to treatment.  He is sorry and feels horrible for his

6    actions.  He has felt horrible for his thoughts and

7    attractions since a young age.  He has had major

8    depression that has really never been treated.  He has a

9    mental disorder.  I mean this is DSM five disorder,

10   pedophilia.  It is mental disorder that he has suffered,

11   and in combination of the major depression, neither of

12   which he has ever received any kind of counseling for.

13        So I think that there is a great deal of hope in the

14   future, in 20 years, 30 years.  There has to be.  Society

15   has got to figure out a way to be able to treat these

16   folks.  And be able to let those out who have the ability

17   to show that they can have those attractions and not act

18   on them.

19        There are many folks who have those attractions and

20   are appropriately controlled by supervision.

21        You know, Ms Aber's argument assumes that in 30 years

22   he would just be out on the street.  He is going to have

23   so many controls on his life that will provide further

24   punishment for what is going on with him he.  Will not

25   have an access to the internet, I can't imagine, whatever

1    it will look like.

2         THE COURT:  Well, that is if we think that medicine

3    is going to change in between now and then.  God knows

4    what will happen to the internet.  It may not even exist.

5    It might be something different.

6         MS GRADY:  That' is true, but the point is, that I

7    think he will be adequately controlled.  I think the

8    risks, that the evaluation and the combination of what we

9    know in reality, I think the risk will be minimized.  I

10   don't think that an additional 20 years suggests

11   warehousing him put him away is really the right thing to

12   do in this case.

13        Your Honor well knows that you have to impose a

14   sentence that is sufficient but not greater than

15   necessary.  When you look at -- I have never seen the life

16   sentence study that was done by the Sentencing Guidelines.

17        What I found to be most interesting is that they

18   consider, the Sentencing Guidelines folks, United States

19   Sentencing Commission, believes that of the -- a de facto

20   life sentence is 39 point one years.  Let's round it up to

21   40.  That is what they say is a life sentence.  If the --

22   de facto meaning, essentially it is a life sentence.  And

23   there are a number of folks, not a great deal, but a small

24   number of folks who are serving that kind of sentence.  If

25   the government is genuine in its request he receive

**J.A. 117**

1    something less than a life sentence, I think Your Honor

2    need to think about a sentence between 30 and 40 years

3    because a de facto life sentence is 39 point one years.

4         He should be commended --

5         THE COURT:  Well, not a de facto life sentence for

6    him.  What is, he 26?

7         MS GRADY:  Right, but --

8         THE COURT:  He is going to live to be more than 66 if

9    he lives out -- you take a look at the actuarial tables in

10    the Virginia code --

11         MS GRADY:  I don't know --

12         THE COURT:  -- it is 80 something.

13         MS GRADY:  For a person living in society.  I'm not

14    sure that is a person living in a high-risk community.  In

15    a high-risk community for not only his Crohn's disease.

16    If that goes bad in any form or fashion Mr. Falte will be

17    in serious trouble if not dead.  The Bureau of Prisons has

18    proven itself to be wholly inadequate medical facility to

19    treat the, to timely treat serious conditions.  But they

20    can treat diabetes, or give insulin.  Do things like that.

21    Even give dialysis.  But for somebody who will need at

22    some point immediate medical care for Crohn's, which is

23    painful, you know, the likelihood that this will erupt in

24    a highly stressful situation is great.  So not only we

25    have to consider what his life would be with Crohn's and

1   how successful that is, but the evaluation indicated that

2   he would be more particularly vulnerable because he is a

3   minority, and he has the problems that he is a sex

4   offender.  He is a sex offender that is not a strapping

5   six-foot, 250 pounds.  He is skinny.  He is not going to

6   be able to defend himself.  He is somebody that will

7   surely be a victim.  So I don't think how long he is going

8   to live, but I think certainly a realistic sentence would

9   be something in the area of 30 to 40 years, because that,

10   I think, is what would be a de facto to life for him.  It

11   would be a life sentence for him.

12       THE COURT:  Okay.

13       MS GRADY:  The reason I have asked for 30 years is

14   that I think that The Court needs to consider the other

15   factors.  Obviously there is protect society.  There is

16   sufficient punishment.  And, you know, he did what he

17   needed to do after his arrest.  He confessed.  He pled to

18   this charge.  He willingly waited and waived a number of

19   speedy trial rights to figure out the right kind of

20   charge, the government.  And we were working on that.  He

21   did what he needed to do, some of the things mentioned in

22   the supplemental government's sentencing position that was

23   of great value.  And the government recognizes that.  So I

24   think The Court can recognize that, too, and place your

25   own value on what he did.

**J.A. 119**

1         In terms of what he did for, in comparison to the

2    other folks, he is not a Mr. Hicks who served up his

3    daughter.  He is not Mr. Faulkner, who apparently has

4    other touching offenses.  He is somebody that should be

5    treated differently than the other two individuals in this

6    case, and that is why I think we could start at the

7    mandatory minimum.

8         Obviously, Congress found that to be a serious

9    sentence.  When I wrote in the, my position paper about

10   which offenses deserved, or by the guidelines, said

11   mandatory life, this is not one of them.  Congress made

12   specific determinations on what should receive a life

13   sentence, and this is not one of them.

14        Judge, his parents came here.  It is obvious from

15   their letters, and obviously from the letter from the

16   sister, they were very surprised at what was going on in

17   his life.  They had no idea.  To think that that stems

18   from Mr. Falte's isolation that he felt as a child.  He

19   wanted to die and wanted to die at age eight.  I think

20   that is depression.  But then you get to when he tries to

21   kill himself at 18 or 19 because he felt guilty about the

22   thoughts that he had in his head.  This is not somebody

23   who gleefully walks down the street and happily, you know,

24   offends children.  He is somebody with a mental disorder

25   and is unhappy, has always been unhappy with his thoughts.

**J.A. 120**

20

1    So I think The Court needs to take that into consideration

2    as well.

3        The interesting thing that is, noteworthy thing, I

4    suppose, is that he suffered his own trauma and he is here

5    today not blaming that trauma on turning his life around

6    and making him want to do something horrible to children.

7    In fact, his family didn't know about it until today.  He

8    kept that secret for that long.

9        I spoke to the parents about it before court.  So I

10   think he is somebody who has taken responsibility and who

11   willingly wants help for what he has, which society has

12   never offered a cure.  He is somebody that joined the peer

13   support group to try to deal with his feelings.  Nobody in

14   the society, the open society, is willing to counsel those

15   folks or help those folks.  It is only through the dark

16   net, or through the internet that these folks are able to

17   try to deal with their attractions.

18       Is there some game playing, or some, you know, sort

19   of bragging or whatever that may have taken place in the

20   chat, yes; but Mr. Falte never, no proof.  Mr. Falte has

21   never offended prior to now, prior to last October.

22       So, he wants a cure.  He is amenable, and I think he

23   will get that if Your Honor were to sentence him to 30

24   years.  I think 50 years, the extra 20 is just a

25   warehouse.  I don't think in this day and age we need to

1    warehouse somebody who has potential.  Somebody who has no

2    previous criminal history, who has a college degree, who

3    has some serious skills in the internet technology.

4        So I would ask The Court to give him some hope, to

5    give him a 30 year sentence that would provide a sentence

6    that is sufficient but not greater than necessary to

7    provide appropriate punishment.

8        I would ask that Your Honor place in the designation,

9    a place in the judgment he be designated to a medical

10   facility.  I have great fear that he will be designated to

11   a lower level and then just deal with his problem if it

12   arises.  And the reason I added the information from the

13   2015 audit is that there is unconscionable delays in the

14   Bureau of Prisons just from a numbers perspective.  If his

15   mental condition deteriorates, he may well die in prison,

16   and that, maybe that accomplishes something, but I think

17   that our system, our society, should do better than that.

18   So I ask that he be placed in a facility, or recommend

19   that he be placed in a facility.  His parents were going

20   to move to Florida, but I think the recent events sort of

21   frightened them away, so I -- the hurricane --

22       THE COURT:  Done what?

23       MS GRADY:  They were going to move to Florida, so the

24   hurricane and all those events --

25       THE COURT:  Oh, those events, not these events.

**J.A. 122**

22

1          MS GRADY:  No, no.

2          Those events have sort of scared them away from that,

3     that possibility.  So I had asked that he be housed in a

4     place closer to Florida, but his official residence under

5     the presentence report --

6          THE COURT:  Some place close to Nashville?

7          MS GRADY:  Yes, sir.  That is where -- that is where

8     his official address is in the presentence report.

9          THE COURT:  All right.  I will suggest they send him

10    to a prison with a medical facility somewhere that is in

11    driving distance of Nashville.

12         MS GRADY:  Thank you, Judge.

13         Judge, so I think the last thing I will say, Your

14    Honor, is this not about vengeance, this is about justice.

15    And sometimes justice needs to be tempered with mercy,

16    Judge.  And I ask that you sentence him to 30 years.

17         THE COURT:  All right.

18         Do you want to respond to that, Ms Aber?

19         MS ABER:  No, Your Honor.

20         THE COURT:  All right.

21         Mr. Falte, do you want to make a statement to The

22    Court?  I have read your letter.  If you would like to get

23    up and make a statement, please come up to the podium here

24    and I will be happy to hear whatever you have to say.

25         Lift up the microphone for him, will you?  Thank you.

**J.A. 123**

1      THE DEFENDANT:  I just, you know, I just want to go

2   over what I said in my letter.  I do apologize.  It is --

3   when I was doing what I was doing, you know, back then, I

4   didn't see it as awful, otherwise I would have never.  The

5   last thing on earth that I would ever want to do is hurt

6   anybody.  So, I mean, I'm here today, yes I did.  You know

7   it destroys me.  So, I just want to apologize to you, to

8   the family, and the girl I hurt.  Just everybody.

9      THE COURT:  Okay?  Anything else.

10      THE DEFENDANT:  That is all, Your Honor.

11      THE COURT:  Thank you very much, Mr. Falte.

12      Let's take a brief recess was.

13            (A recess was taken)

14      THE COURT:  Okay.

15      Well, I will now discuss the 3553(a) factors and the

16   sentence in this case.

17      First, with respect to the first factor I am to

18   consider is the nature and circumstances of the offense.

19   It is just terrible.  It is horrible.  This is a gentleman

20   who was involved in the dark web.  He was on Thor.  He was

21   involved in a web site that traded child porn.  He was

22   involved in chat rooms where they talked about how to get

23   kids to have sex with, not just kids, but infants.  He was

24   able to arrange through the internet the ability to find

25   someone who would essentially lend his daughter to him for

1   sexual purposes.  He met with -- that was with Mr. Dix in

2   northern Virginia.  He traveled from Tennessee to Virginia

3   to meet the little girl with Mr. Dix several times.  He

4   met the child.  Got her toys, got her food, ice cream, and

5   so forth.  They then went and had sex with her.  They made

6   videos of themselves having sex with the child.  Mr. Falte

7   touched her genitals.  He annually penetrated her.  He

8   masturbated and ejaculated on her.  You know, when you

9   look at kids that age they are just so trusting, and they

10  are trusting that adults will help them through life.

11  And, you know, they are not able to distinguish one adult

12  from another.  And they assume that it is always going to

13  do the right thing.  I don't know whether this little

14  girl -- I don't know what she will remember of this when

15  she gets older.  I hope it is nothing of it.  But I doubt

16  that that will be the case.

17       All right.  The characteristics of the defendant is

18  the next factor I am to consider.

19       He has, much to his credit, no criminal history.  On

20  a personal level he had a very nice upbringing with the

21  Faltes.  He had a caring family.  He had difficulties with

22  school, but much to his credit he worked his way through

23  those.  He was shy and withdrawn, and, you know, you never

24  know what is going on with somebody else.  And, obviously,

25  where do you draw the line in making a judgment about

1    somebody who is shy and withdrawn versus somebody who is

2    depressed?

3        Now, the Faltes did absolutely a very nice job with

4    getting Ding through life and out into the world doing

5    well not recognizing that there was another side to him.

6    And, you know, we all have sides we don't share with other

7    people.  And that is what we had here.

8        The next factor is the personal history.  I have

9    talked about that.  He has no dependents, no children, not

10    married.  Physically, he has got Crohn's disease, which is

11    a very bad problem, and as I said, to Ms Grady, my order

12    in this case will direct that he be placed in a facility

13    that has first-rate medical care, or the best medical care

14    that is available in the Bureau of Prisons.

15        He does have mental health issues, obviously;

16    depression, pedophilia.  You know he went through life

17    with sort of a lack of affect.  And that, I remember when

18    he came in to make the guilty plea, I noticed that about

19    him as well.

20        To his credit, he does not have a substance abuse

21    problem.  He is a college grad.  He has computer skills.

22    You know, if I had to -- he had has been steadily employed

23    if -- I had to sum him up, he obviously has some good

24    sides, but there is a horrible and thoughtless part of his

25    character that manifests itself in the conduct that is

1    unacceptable and awful.

2        The next factor is the need for the sentence to a

3    reflect the seriousness of the offense.  If he killed this

4    girl, she wouldn't live in torture the rest of her life.

5    But he didn't, and so she is the one who has a life

6    sentence in this case.

7        Respect for the law.  Well, honestly there is

8    absolutely none shown by Mr. Falte here.  He lived and

9    worked -- he lived and worked in the evil part of the web.

10   Traveled all around the country on numerous occasions, all

11   to for the purpose of victimizing this child.

12       The next factor is the need to provide just

13   punishment.  Well, the guidelines make it clear and the

14   sentencing statute makes it clear by establishing a

15   mandatory minimum that severe punishment is called for

16   here.

17       The next factor is need to afford adequate

18   deterrence.  Well, you know deterrence is an interesting

19   topic.  Its not too clear that anything that I do to

20   criminals deters other criminals from committing crimes.

21   That is certainly absolutely clear to me in drug cases and

22   violent cases, that is true.  The only cases where I think

23   there is much of a chance of general deterrence is white

24   collar crimes.  I hope that what happens to Mr. Falte

25   today is a deterrent to others who have similar urges to

1    him.  I am sure that it will be an adequate deterrence to

2    him to ever commit this again, but he is going to be out

3    of circulation for a long time.

4        The next factor is the need for the sentence to

5    protect the public from further crimes of the defendant.

6        Well, I can't -- of all of the 3553 factors, the

7    nature and circumstances of the offense and the need to

8    protect the public are clearly the most important.  It is

9    just unconscionable to put Mr. Falte in a place to do

10    anything like this again.

11        You know, the likelihood of recidivism in three to

12    five years is, I don't know, something like three to five

13    percent.  Well, you know, that means one out of every 20

14    people does something.  That is pretty dangerous.

15        The next factor is the need to give him education,

16    vocational training, medical care, and other treatment.  I

17    am going to take care of the medical care for his Crohn's,

18    and I don't think the other factors play into this very

19    much.

20        The kinds of sentences available are a maximum of

21    life, mandatory minimum of 30 years.  There are all kinds

22    of fines and assessments.  I will find that he is unable

23    to pay the $5,000 assessment for sex crimes.  And that he

24    is unable to pay a fine at all.

25        I am to take into into account the guidelines, which

28

1    are life.

2        To avoid sentencing disparities among similarly

3    situated defendants.  Well, anybody who gets convicted

4    under this statute is going away for a long time.

5        Restitution is obviously a factor here, and I will

6    enter an order -- I am not sure -- tell me this, Ms Aber.

7    How does it work?  I would assume that at some stage in

8    the future the child will need some sort of treatment.

9    How do I turn that into an order that Mr. Falte is

10   supposed to pay without any -- without a number?  You can

11   address it from there.  That is fine.  Or walk up here,

12   whatever you want.

13       MS ABER:  I am clearly no expert, but I believe

14   restitution would have to be a particular number

15   identified today and put in the judgment.  As of today,

16   the government consulted with the mother and grandmother.

17   They do not want to seek restitution.  They anticipate if

18   future services are needed they will obtain it through the

19   community.  That is in part based on Mr. Falte's

20   indigence.  So I don't believe restitution is needed today

21   or in the future, that is not legally possible, and the

22   government is not requesting it.

23       THE COURT:  Okay.  No restitution.

24       Okay.  All right.

25       There are two motions for variance, one by the

1   government to go down to 50 years for his cooperation; and

2   one to by the defendant to go down to 30 years.  Or 40

3   years, depending on how you look at the case.

4        Forty seems to be what they were arguing today at

5   some stage.  It is 30 at others.

6        I think the other factors in the case outweigh the

7   motion for variance, and that motion will be denied.

8        Mr. Falte, please stand up.

9        Mr. Falte, pursuant to the factors set forth in 18 US

10  code section 3553(a) and the Sentencing Reform Act of

11  1984, and having considered the Federal Sentencing

12  Guidelines as advisory, it is the judgment of The Court

13  that you are hereby committed to the custody of the US

14  Bureau of Prisons to be imprisoned for a term of life.

15  This sentence is sufficient but not does not exceed the

16  amount of time necessary to achieve the goals of

17  sentencing as set forth in 18 U.S. code section 3553.  It

18  reflects the seriousness of the offense, provides just

19  punishment, affords adequate deterrence to criminal

20  conduct, and protects the public from further crimes that

21  you may commit.  I recommend that you participate in any

22  psychological programs offered by the Bureau of Prisons,

23  and that you be imprisoned somewhere near Nashville, as

24  close as possible to that.  And that you be in a facility

25  that has very, very strong medical care.

**J.A. 130**

1      If you should ever get out of imprisonment you will

2    be placed on supervised release for a term of life.  And

3    if you get out of prison you have to report to the Bureau

4    of Prisons.  If can't commit federal, state, or local

5    crimes, possess a controlled substance, or possess a

6    firearm or destructive device.  You will comply with the

7    standard conditions of supervised release.  You will

8    participate in any psychological programs deemed necessary

9    by the probation office with cost to be paid by the

10   government.

11      You will not be put on a plethysmograph, which seems

12   barbaric to me.  I have considered your net worth and

13   liquid assets, your life style and financial needs, your

14   earning potential and the dependents relying on your

15   support.  You are not capable of paying a fine.  No fine

16   will be imposed.  You have to pay a special assessment in

17   the amount of a hundred dollars, which is due immediately.

18      Was there a forfeiture?

19      MS ABER:  Not here, Your Honor.

20      THE COURT:  Okay.

21      Mr. Falte, you have 14 days to appeal this sentence

22   to the U.S. Court of Appeals for the Fourth Circuit.  You

23   do that by filing a notice of appeal, which Ms Grady will

24   do if you ask her to do it.  You don't have to pay a fee.

25   You can do it for free, and they will appoint a lawyer to

1  handle your appeal.  If you can't ahold of Ms Grady, send

2  a letter to the clerk of this court saying you want to

3  appeal.

4      Mr. Falte, this is -- I have wrestled with this case

5  since the first day I met you.  And it just makes me sick.

6  The whole thing is sad for everybody involved, for you,

7  your parents, for the victims, for the lawyers.

8      I don't know what your life is going to be like going

9  forward from here.  You going to find the ability to put

10  one step in front of the other as you go through the rest

11  of your life.  You are going to be in prison and going to

12  be there with a lot of people who don't have the

13  intelligence and education and skills that you have.

14      And I hope that you will find it within yourself at

15  some stage to try to help those people to move on, to help

16  them find meaning to their lives so that they can at the

17  end of their sentences move on to a better life.  I hope

18  you can find a way to be a servant to others while you are

19  in prison.

20      I have arranged with the Marshals for you to be able

21  to have a few moments to talk with your parents here in

22  the courtroom before you leave.

23      God bless you.

24      Let's recess court.

25                      HEARING ADJOURNED

**J.A. 132**

1           THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

2

3                   GILBERT FRANK HALASZ, RMR

4                    OFFICIAL COURT REPORTER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Richmond Division

UNITED STATES OF AMERICA

v.

Case Number:   3:17CR00049-001

PATRICK FALTE,

USM Number:   90412-083

Defendant's Attorney:   Carolyn V. Grady, Esq.

Defendant.

## JUDGMENT IN A CRIMINAL CASE

The defendant pleaded guilty to a One Count Criminal Information.

Accordingly, the defendant is adjudged guilty of the following counts involving the indicated offenses.

| Title and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| 18:2241(c) | AGGRAVATED SEXUAL ABUSE | Felony | 9/30/2016 | One |

As pronounced on September 15, 2017, the defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Judgment imposed this 15th day of September, 2017.

/s/
John A. Gibney, Jr.
United States District Judge

Dated:   9/19/17

**J.A. 134**

**Case Number:**      3:17CR00049-001
**Defendant's Name:**   **FALTE, PATRICK**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE.

The Court makes the following recommendations to the Bureau of Prisons:

1) THAT THE DEFENDANT BE DESIGNATED TO A MEDICAL FACILITY THAT CAN ADEQUATELY ADDRESS HIS HEALTH ISSUES;
2) THAT THE DEFENDANT BE DESIGNATED TO A FACILITY NEAR HIS FAMILY WHO RESIDE NEAR NASHVILLE, TN;
3) THAT THE DEFENDANT PARTICIPATE IN A PROGRAM FOR MENTAL HEALTH TREATMENT.

The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to_____
at_____, with a certified copy of this Judgment.

_____

UNITED STATES MARSHAL

By        _____

DEPUTY UNITED STATES MARSHAL

**J.A. 135**

USCA4 Appeal: 17-4630    Doc: 21    Filed: 02/12/2018    Pg: 140 of 146

AO 245B (Rev. 09/11) Case 3:17-cr-00049-JAG Judgment 67 Filed 09/19/17 Page 3 of 6 PageID# 264    Page 3 of 6
Sheet 3 – Supervised Release

| | |
|---|---|
| Case Number: | 3:17CR00049-001 |
| Defendant's Name: | FALTE, PATRICK |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of LIFE.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of supervised release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

## STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:
1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**J.A. 136**

AO 245B (Rev. Case 3:17-cr-00049-JAG Document 67    Filed 09/19/17    Page 4 of 6 PageID# 265    Page 4 of 6
Sheet 3A – Supervised Release

| Case Number: | 3:17CR00049-001 |
|---|---|
| Defendant's Name: | **FALTE, PATRICK** |

## SPECIAL CONDITIONS OF SUPERVISION

While on supervised release pursuant to this Judgment, the defendant shall also comply with the following additional special conditions:

1) The defendant shall participate, at no cost to the defendant, in a program approved by the United States Probation Office for mental health treatment.

2) The defendant shall waive all rights of confidentiality regarding mental health treatment in order to allow the release of information to the probation officer and authorize communication between the probation officer and the treatment provider.

3) The defendant will not be subjected to plethysmography.

**J.A. 137**

| Case Number: | 3:17CR00049-001 |
| Defendant's Name: | FALTE, PATRICK |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Page 6.

| | Count | Assessment | Fine | Restitution |
|---|---|---|---|---|
| | One | $100.00 | $0.00 | $0.00 |
| | | $0.00 | $0.00 | $0.00 |
| TOTALS: | | $100.00 | $0.00 | $0.00 |

## FINES

No fines have been imposed in this case.

## SPECIAL ASSESSMENT

The Court finds that the defendant is indigent, so does not impose the additional special assessment under 18 U.S.C. §3014.

| | |
|---|---|
| **Case Number:** | 3:17CR00049-001 |
| **Defendant's Name:** | **FALTE, PATRICK** |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed. Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment, fine, or special assessment by the United States.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

UNITED STATES OF AMERICA
                              Plaintiff,

v.                                         Case No. 3:17cr49

PATRICK DANE FALTE,
                              Defendant.

**Notice of Appeal**

Defendant Patrick Dane Falte, by counsel, hereby notes his appeal to the

United States Court of Appeals for the Fourth Circuit, from the order of the District

Court entered September 19, 2017, from the proceedings held on September 15,

2017.

Respectfully submitted,
PATRICK DANE FALTE

_____/s/_____
        By:   Counsel

Carolyn V. Grady, Esq.
Va. Bar No. 30445
Counsel for Mr. Falte
Assistant Federal Public Defender
701 East Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0855
(804) 648-5033 (Fax)
Carolyn_Grady@fd.org

**J.A. 140**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2017, I electronically filed the foregoing with the Clerk of the Court  using the CM/ECCF system, which will send a notification of such filing (NEF) to the following:

Jessica D. Aber, Assistant U.S. Attorney
919 E. Main Street, Suite 1900
Richmond, VA 23219
Jessica.D.Aber@usdoj.gov

and

Lauren Britsch
US Department of Justice, Criminal Division
1400 New York Ave NW
Washington, DC 20530
lauren.britsch@usdoj.gov

<div align="center">
_____/s/_____
Counsel
</div>

Carolyn V. Grady, Esq.
Va. Bar No. 30445
Counsel for Mr. Falte
Assistant Federal Public Defender
701 East Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0855
(804) 648-5033 (Fax)
Carolyn_Grady@fd.org

<div align="right">
**J.A. 141**
</div>

This page intentionally left blank for double-sided pagination and printing